T.C. Memo. 2011-84

UNITED STATES TAX COURT

1982 EAST, LLC, SOLOMON D. ASSER, TAX MATTERS PARTNER,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30052-08.                     Filed April 12, 2011.

<u>John P. Barrie</u>, for petitioner.[*]

<u>Michael D. Wilder</u>, <u>Sameera Y. Hasan</u>, <u>Michael Y. Chin</u>, and
<u>Michael A. Sienkiewicz</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  This case is a partnership-level proceeding
under the Tax Equity and Fiscal Responsibility Act of 1982
(TEFRA), Pub. L. 97-248, sec. 402, 96 Stat. 648, as amended.  The

---

[*]Brief amicus curiae was filed by <u>Kathryn Keneally</u> for Trust
for Architectural Easements.

TEFRA partnership, 1982 East, LLC (LLC), claimed a $6,570,000 deduction on its 2004 Form 1065, U.S. Return of Partnership Income (2004 return), for a December 30, 2004, contribution of a historic preservation easement (facade easement) and unused development rights (UDRs) (collectively, donated property).[1] Respondent disallowed that deduction in a notice of final partnership administrative adjustment (FPAA) issued to LLC's tax matters partner, Solomon D. Asser (Mr. Asser). Respondent also determined in the FPAA that an accuracy-related penalty applied to any underpayment of tax attributable to the $6,570,000 disallowance. Respondent's primary determination in that respect was that the penalty equaled 40 percent of the underpayment because of a gross valuation misstatement under section 6662(h).[2] Alternatively, respondent determined that the penalty equaled 20 percent of the underpayment because of negligence or disregard of rules or regulations under section 6662(b)(1) or a substantial understatement of income tax under section 6662(b)(2).

We decide two issues. First, we decide whether LLC is entitled to any part of the $6,570,000 deduction. We hold it is

_____

[1]LLC also claimed on the 2004 return that it was entitled to deduct cash contributions of $452,500 which were related to the contribution of the donated property. Respondent did not disallow LLC's deduction of the cash contributions, and that deduction is not in issue.

[2]Unless otherwise indicated, section references are to the applicable versions of the Internal Revenue Code, and Rule references are to the Tax Court Rules of Practice and Procedure.

entitled to none of the deduction. Second, we decide whether LLC is liable for a 20-percent accuracy-related penalty under section 6662(a) on any underpayment of tax attributable to the disallowance of the deduction.[3] We hold it is not liable for the penalty.

FINDINGS OF FACT

I. Preliminaries

Some facts were stipulated and are so found. The stipulations of fact and the accompanying exhibits are incorporated herein by this reference. When the petition was filed, LLC's principal place of business was in New York, New York (New York City).

II. LLC, Mr. Asser, and NAT

A. LLC

LLC is a limited liability company formed in May 2002 primarily to purchase and operate real estate at 19 East 82d Street in New York City. LLC has both domestic and foreign members. LLC is characterized for Federal tax purposes as a partnership subject to TEFRA. During 2004, LLC owned real property (subject property) in New York City at 19 East 82d Street.

---

[3]Given our holding on the first issue, respondent abandons his primary determination that the 40-percent accuracy-related penalty under sec. 6662(h) applies in this case.

B.  Mr. Asser

Mr. Asser is one of LLC's domestic members, and he is a managing member of LLC and its tax matters partner.  He holds three professional degrees, the first in architecture, the second in urban planning, and the third in architecture and urban design.  For more than two decades, Mr. Asser has been in the design, building, and rehabilitation of buildings in New York City, including buildings in landmark districts.  He currently owns and operates a construction management and general contracting firm, Tecny Group, Inc., the primary business of which is the rehabilitation of buildings.[4]  Mr. Asser is familiar with the New York City Landmarks Preservation Commission (LPC) and the New York City zoning rules as applicable to the subject property.[5]

C.  NAT

The National Architectural Trust (NAT) is tax exempt under section 501(c)(3) and a qualified organization under section 170(h)(3).[6]  NAT advertises that taxpayers can receive significant tax benefits by contributing historic preservation

---

[4]Tecny Group, Inc., was formerly named Tecny Landmark Corp. We refer to both entities as Tecny.

[5]The LPC is a New York City agency responsible for identifying and designating New York City landmarks and historic districts.  The LPC is also responsible for protecting and preserving those landmarks and historic districts.

[6]NAT changed its name in 2007 to "Trust for Architectural Easements".  We refer to both entities as NAT.

easements to NAT and assists taxpayers who make such contributions to structure and report the contributions in a way that NAT believes will entitle the taxpayers to the advertised benefits.

III.  Subject Property

As of December 30, 2004, the date LLC contributed the donated property to NAT, the subject property included a rectangular lot and a five-story townhouse (townhouse).  The lot was approximately 2,554 square feet.  The townhouse was constructed in 1894 and had 10,375 square feet of living area (excluding the cellar).

The subject property is sited within the Metropolitan Museum Historic District and is in a C5-1 restricted central commercial zoning district within the Special Madison Avenue Preservation District.  Because of its location, the subject property is subject to New York City's landmark and zoning laws.  Those laws set the maximum building capacity for each square foot in a lot by reference to a formula known as the "floor area ratio".[7]  The laws also set a maximum height at which a structure may be built on the lot.

---

[7]For example, if a 5,000-square-foot lot had a floor area ratio of 10, then the zoning rules would allow a building of up to 50,000 square feet on the lot.  To the extent that the building was less than 50,000 square feet, the difference between the actual square footage and 50,000 would be the lot's UDRs.

IV.  Mr. Asser's Contacts With NAT

Mr. Asser first heard about NAT in 2002, when one of his partners gave Mr. Asser a NAT promotional handout.  Mr. Asser discussed the promotion with others in his business and with representatives of NAT.  He also attended free seminars where NAT representatives (none of whom was a lawyer) discussed the significant tax benefits that could be obtained through the contributions of preservation easements to NAT with little to no practical effect on the use, value, or marketability of the servient property.

NAT prepared and gave to Mr. Asser literature discussing NAT's promotion.  Mr. Asser read all of this literature, and he read most of it before LLC decided to participate in the promotion.  The literature suggested that a donor of an easement could receive a significant charitable contribution deduction for Federal and State tax purposes equal to a set percentage (between 10 and 15 percent but usually 11 percent) of the fair market value of the property burdened with the easement.  The literature indicated that the donor of a facade easement to NAT would have to obtain NAT's permission before changing the property's exterior.  The literature stated, however:  "Since these properties reside in historic districts, pre-approval of exterior changes is, in most cases, already required by local government regulations" and "Properties qualifying for this program are

usually regulated by local government ordinances that restrict exterior changes".

V.  LLC's Purchase of the Subject Property

LLC purchased the subject property on November 5, 2002, for $8 million, aiming to take advantage of the promotion while at the same time expeditiously reselling the subject property at a profit.  LLC paid the $8 million with $2 million cash and $6 million obtained through a mortgage loan from Wachovia Bank, N.A. (Wachovia).  When LLC purchased the subject property, the townhouse was in need of complete renovation.  LLC opted to renovate the townhouse as a single-family townhome and solicited and received the requisite approval of the LPC to fully gut the townhouse and to perform that renovation.

VI.  LLC's Facade Conservation Easement Application

On April 10, 2003, before the renovation work began, LLC applied to NAT for approval to contribute the donated property to NAT, and LLC gave NAT a required $1,000 "good faith deposit".[8] The next day, NAT wrote to LLC thanking it for its application. On May 12, 2003, the U.S. Department of the Interior National Park Service classified the subject property as a "certified historic structure", noting that "This property is noteworthy for

_____

[8]NAT's acceptance of a preservation easement was generally contingent on the donor making a "cash contribution" to NAT of 10 percent of the fair market value of the easement.  The "good faith deposit" was a downpayment on the required "cash contribution".

the retention of its exterior presence and much of the property's period details remain within. This neo-Italian Renaissance structure stands in contrast to its more retrained [sic] neighbors". NAT helped get the subject property certified as a historic structure.

VII.   Deed of Easement

NAT structured LLC's contribution of the donated property to be complete when a conservation deed of easement (deed of easement) was executed by LLC, notarized, and executed by NAT. On or about June 10, 2003, NAT prepared a deed of easement dated June 10, 2003. The deed of easement prohibited LLC and its successors (collectively, LLC) from altering the subject property's "Protected Facade" without the written consent of NAT or its successors (collectively, NAT). The "Protected Facade" included all exterior surfaces, e.g., walls, roofs, and chimneys, that were visible from the street level on the opposite side of East 82d Street. Among other things, the deed of easement prohibited LLC from erecting "any new or additional exterior improvements on the [subject] Property or in the open space above or surrounding the * * * townhouse" without the express written consent of NAT.

The deed of easement stated that the UDRs included "any and all rights, however designated, now or hereafter associated with the [subject] Property or any other property that may be used

pursuant to applicable zoning laws or other government laws or regulations to compute permitted size, height, bulk or number of structures, development density, lot yield, or any similar development variable on or pertaining to the [subject] Property or any other property."  The deed of easement also stated that neither LLC nor NAT could use, exercise, or transfer the UDRs and that LLC was donating those rights to NAT for the purpose of forever removing and extinguishing those rights.  The deed of easement stated that in the event that the donated easement was ever extinguished through a judicial decree, NAT

> will be entitled to receive upon the subsequent sale, exchange, or involuntary conversion of the [subject] Property, a portion of the proceeds from such sale, exchange or conversion equal to the same proportion that the value of the initial * * * donation bore to the entire value of the property at the time of the donation as estimated by a state licensed appraiser, unless controlling state law provides that * * * LLC is entitled to the full proceeds in such situations, without regard to the Easement.  * * * NAT agrees to use any proceeds so realized in a manner consistent with the conservation purpose of the original contribution.

VIII.  LLC's Subsequent Financing of the Property

On January 22, 2004, Wachovia assigned the mortgage on the subject property to First Republic Bank.  On the same day, LLC took out a $3,390,000 mortgage loan from First Republic Bank to finance the renovation of the subject property, and LLC and First Republic Bank consolidated all mortgages on the subject property into a single mortgage with a $9,350,000 principal amount.  First

Republic Bank was then the sole lender and mortgage holder with respect to the subject property.

In 2003 or 2004, First Republic Bank was given the deed of easement and a proposed lender agreement (lender agreement). The lender agreement stated that First Republic Bank was subordinating its rights in the subject property to NAT's rights to enforce the conservation purpose of the donated property in perpetuity, subject to the following conditions and stipulations:

(a) * * * First Republic Bank and its assignees shall have a prior claim to all insurance proceeds as a result of any casualty, hazard or accident occurring to or about the [subject] Property and all proceeds of condemnation, and shall be entitled to same in preference to * * * NAT until the Mortgage/the Deed of Trust is paid off and discharged, notwithstanding that the Mortgage/the Deed of Trust is subordinate in priority to the Easement.

* * * * * * *

(c) Nothing contained in this paragraph or in this Easement shall be construed to give * * * First Republic Bank the right to violate the terms of this Easement or to extinguish this Easement by taking title to the [subject] Property by foreclosure or otherwise.

First Republic Bank scrutinized the lender agreement to determine whether the agreement would affect the bank's collateral value in the subject property and concluded that it would not. First Republic Bank signed the lender agreement on July 15, 2004, and the lender agreement was attached to and incorporated into the deed of easement.

IX.  2004 Appraisal

LLC obtained an appraisal (2004 appraisal) from Jerome Haims Realty, Inc. (Haims), on or about June 7, 2004. The 2004 appraisal was dated June 7, 2004, on which date LLC's renovation of the subject property was not complete. LLC had hired Tecny and another firm to renovate the subject property. Tecny performed that renovation in 2004 and 2005. The exterior renovation was complete as of December 30, 2004, but interior renovation (e.g., improvements, painting and finishing, and installation of woodwork) was still in progress.

The 2004 appraisal valued the donated property as of February 15, 2005, which as of June 7, 2004, was the estimated completion date of the interior renovation. The 2004 appraisal projected that the February 15, 2005, value of the facade easement would be $2,600,000 and that the value of the UDRs (which the 2004 appraisal stated totaled 15,165 square feet) would be $3,870,000, for a total value of $6,470,000.

Mr. Asser reviewed the 2004 appraisal, and he accepted it even though he believed that the values were too low. NAT advertises to its contributors of conservation easements that Haims is a preapproved appraiser of such easements, and Haims has performed over 100 appraisals pursuant to those referrals. As of the time of the 2004 appraisal, LLC and Haims had a solid

business relationship and LLC had hired Haims many times to obtain other appraisals.

## X.   LLC's December 8, 2004, Application and Crossover Addendum

On December 6, 2004, NAT gave LLC:  (1) A second facade conservation easement application (which was more detailed than the first application); and (2) a "Facade Conservation Easement Application Crossover Addendum" (crossover addendum).  On December 8, 2004, Mr. Asser, on behalf of LLC, completed both the second application and the crossover addendum.

The crossover addendum stated that LLC could contribute the donated property to NAT in 2004 and qualify for a charitable contribution deduction for that year even though some of the deduction requirements would not be met until 2005.  The crossover addendum required that LLC obtain a "final report" from a "qualified appraiser" within 60 days and that LLC give NAT a "completed closing package", consisting of a signed and notarized deed of easement, necessary recording documents, and the cash contribution, within 55 days of the appraisal date or December 20, 2004, whichever came first.  The crossover addendum stated that when those requirements were met, NAT would deliver to LLC a completed Form 8283, Noncash Charitable Contributions, which had to be filed with the 2004 return for LLC to receive a charitable contribution deduction for the donated property.

On December 17, 2004, Mr. Asser wrote NAT a check for $451,500. This check represented the balance of the "cash contribution" that NAT required LLC to make as a condition of LLC's contribution of the donated property.

XI.  The Noncash Contribution

Mr. Asser, on behalf of LLC, executed the deed of easement on December 26, 2004, and his signature was notarized on the same day. Four days later, NAT effected its acceptance of the donated property by executing the deed of easement. NAT sent LLC an acknowledgment letter, dated March 31, 2005, thanking LLC for the cash and noncash contributions and enclosing a completed copy of page 2 of Form 8283. The New York City Department of Finance, Office of the City Register, recorded the deed of easement on June 10, 2005.

XII.  2005 Appraisal

Before LLC filed its 2004 return, NAT told Mr. Asser that LLC needed to get a new appraisal because the 2004 appraisal was prepared too early. Mr. Asser obtained a second appraisal from Haims (2005 appraisal) on February 8, 2005. The 2005 appraisal valued the noncash contribution prospectively as of March 31, 2005, which as of February 8, 2005, was the estimated completion date of the interior renovation. The 2005 appraisal concluded that the prospective fair market values of the facade easement

and the UDRs would be $2,690,000 and $3,880,000, respectively, or $6,570,000 in total.

XIII.  LLC's 2004 Partnership Tax Return

LLC timely filed the 2004 return on October 17, 2005.  The 2004 return included the second page of Form 8283 and included the 2005 appraisal as an attachment.  The second page of Form 8283 stated a contribution date of December 30, 2004, and a fair market value of the donated property of $6,570,000.  The second page of Form 8283 reported that the noncash contribution was a "Historic Preservation Easement" and did not mention the UDRs.  The 2005 appraisal stated that the noncash contribution consisted of the donated property.

XIV.  Preparation of the 2004 Return

The 2004 return was prepared by Irwin Weissman (Mr. Weissman).  Mr. Weissman has been a certified public accountant since 1962, and he has been a principal in a small accounting firm since 1987.  Mr. Weissman has prepared only one tax return that claimed a charitable contribution deduction for a facade easement--the 2004 return.

XV.  2009 Appraisal

Mr. Asser obtained a third appraisal (2009 appraisal) from Haims in late 2009.  Haims prepared the 2009 appraisal on or about September 17, 2009.  The 2009 appraisal valued the donated property as of December 30, 2004.

OPINION

## I.  Burden of Proof

Respondent determined that LLC's $6,570,000 noncash contribution did not qualify for a charitable contribution deduction under section 170.  This determination is presumed correct, and petitioner must prove it wrong in order to prevail. See Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Deputy v. du Pont, 308 U.S. 488, 493 (1940) (stating that deductions are a matter of legislative grace to which taxpayers must prove their entitlement).  While section 7491(a) may place the burden of proof upon the Commissioner in certain circumstances, petitioner conceded at trial that petitioner has the burden of proof.[9]

## II.  Noncash Contribution

A taxpayer is generally allowed a deduction for any charitable contribution made during the taxable year.  Sec. 170(a)(1).  A charitable contribution includes a gift of property to a charitable organization, made with charitable intent and without the receipt or expectation of receipt of adequate consideration.  See Hernandez v. Commissioner, 490 U.S. 680, 690 (1989); United States v. Am. Bar Endowment, 477 U.S. 105, 116-118 (1986); see also sec. 1.170A-1(h)(1) and (2), Income Tax Regs. While a taxpayer is generally not allowed a charitable

---

[9]Petitioner's opening brief is consistent with petitioner's concession in that the brief does not reference sec. 7491(a).

contribution deduction for a gift of property consisting of less than an entire interest in that property, an exception is made for a "qualified conservation contribution." See sec. 170(f)(3)(A), (B)(iii).

A "qualified conservation contribution" is a contribution (1) of a "qualified real property interest," (2) to a "qualified organization," (3) which is made "exclusively for conservation purposes." Sec. 170(h)(1); see also sec. 1.170A-14(a), Income Tax Regs. We focus on the third requirement; i.e., whether LLC's contribution of the donated property was exclusively for conservation purposes. A contribution is made exclusively for conservation purposes only if it meets the requirements of section 170(h)(4) and (5). Glass v. Commissioner, 124 T.C. 258, 277 (2005), affd. 471 F.3d 698 (6th Cir. 2006). We begin our analysis with the requirements of section 170(h)(5).

A. Section 170(h)(5)

Section 170(h)(5)(A) provides that "A contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity." The parties disagree on whether the conservation purpose of the donated property is protected in perpetuity. Respondent argues that the donated property is not protected in perpetuity by virtue of First Republic Bank's mortgage on the subject property. Petitioner argues that the conservation purpose of the donated

property is protected in perpetuity because First Republic Bank subordinated its interest in the subject property to NAT's right to enforce the terms of the easement.

The perpetuity requirement of section 170(h)(5)(A) has its origins in the Tax Reduction and Simplification Act of 1977 (TRSA 1977), Pub. L. 95-30, sec. 309(a), 91 Stat. 154.[10]  In TRSA 1977 sec. 309, Congress temporarily allowed a charitable contribution deduction for an "easement with respect to real property granted in perpetuity to * * * [a governmental unit or qualifying charitable organization] exclusively for conservation purposes". The conference report on TRSA 1977 explained:

> While it is intended that the term "conservation purposes" be liberally construed with regard to the types of property with respect to which deductible conservation easements * * * may be granted, it is also intended that contributions of perpetual easements * * * qualify for the deduction only in situations where the conservation purposes of protecting or preserving the property will in practice be carried out.  Thus, it is intended that a contribution of a conservation easement * * * qualify for a deduction only if the holding of the easement * * * is related to the purpose or function constituting the donee's purpose for exemption (organizations such as nature

---

[10]The Tax Reform Act of 1976, Pub. L. 94-455, sec. 2124(e), 90 Stat. 1919, authorized a deduction for the donation of an "easement with respect to real property of not less than 30 years' duration" granted to a governmental unit or qualifying charitable organization made "exclusively for conservation purposes".  See Glass v. Commissioner, 124 T.C. 258, 277-280 (2005) (examining the legislative history of the requirement that a qualified contribution of a conservation easement be exclusively for conservation purposes), affd. 471 F.3d 698 (6th Cir. 2006).  Congress, however, did not amend sec. 170(f)(3) to require that the easement be granted in perpetuity until TRSA 1977.

conservancies, environmental, and historic trusts,
State and local governments, etc.) and the donee is
able to enforce its rights as holder of the easement *
* * and protect the conservation purposes which the
contribution is intended to advance.  The requirement
that the contribution be exclusively for conservation
purposes is also intended to limit deductible
contributions to those transfers which require that the
donee hold the easement * * * exclusively for
conservation purposes (i.e., that they not be
transferable by the donee in exchange for money, other
property, or services).  [H. Conf. Rept. 95-263, at 30-
31 (1977), 1977-1 C.B. 519, 523.]

Congress again drew attention to the protection of a contributed

conservation easement in the Act of Dec. 17, 1980 (1980 Act),

Pub. L. 96-541, sec. 6(a), 94 Stat. 3206,  which extended

permanently the deduction for a charitable contribution of a

qualified conservation easement.[11]  The Senate report

accompanying the enactment stated:

The bill retains the present law requirement that
contributions be made "exclusively for conservation
purposes."  Moreover, the bill explicitly provides that
this requirement is not satisfied unless the
conservation purpose is protected in perpetuity.  The
contribution must involve legally enforceable
restrictions on the interest in the property retained
by the donor that would prevent uses of the retained
interest inconsistent with the conservation purposes.
* * *

*    *    *    *    *    *    *

---

[11]As amended in 1977, the provisions of former sec.
170(f)(3)(B)(iii) (excepting from the partial interest limitation
a taxpayer's contribution of a qualified conservation easement)
did not apply to contributions made after June 13, 1981.  TRSA
1977 sec. 309(b)(1), 91 Stat. 154.  In the 1980 Act sec. 6(c), 94
Stat. 3207, Congress effectively made permanent the deduction for
such a contribution.

By requiring that the conservation purpose be protected in perpetuity, the committee intends that the perpetual restrictions must be enforceable by the donee organization (and successors in interest) against all other parties in interest (including successors in interest).  * * *

* * * The requirement that the conservation purpose be protected in perpetuity also is intended to limit deductible contributions to those transfers which require that the donee (or successor in interest) hold the conservation easement (or other restriction) or other property interests exclusively for conservation purposes (i.e., that they not be transferable by the donee except to other qualified organizations that also will hold the perpetual restriction or property exclusively for conservation purposes).  [S. Rept. 96-1007, at 13-14 (1980), 1980-2 C.B. 599, 605-606.]

The Secretary published final regulations interpreting section 170(h)(5) on January 14, 1986.  T.D. 8069, 1986-1 C.B. 89.  These regulations in relevant part interpret section 170(h)(5)(A) as follows:

§ 1.170A-14. Qualified conservation contributions. * * *

* * * * * * *

(g) Enforceable in perpetuity--(1) In general.--In the case of any donation under this section, any interest in the property retained by the donor (and the donor's successors in interest) must be subject to legally enforceable restrictions (for example, by recordation in the land records of the jurisdiction in which the property is located) that will prevent uses of the retained interest inconsistent with the conservation purposes of the donation.  * * *

(2) Protection of a conservation purpose in case of donation of property subject to a mortgage.--In the case of conservation contributions made after February 13, 1986, no deduction will be permitted under this section for an interest in property which is subject to a mortgage unless the mortgagee subordinates its rights in the property to the right of the qualified

organization to enforce the conservation purposes of the gift in perpetuity.  For conservation contributions made prior to February 14, 1986, the requirement of section 170(h)(5)(A) is satisfied in the case of mortgaged property (with respect to which the mortgagee has not subordinated its rights) only if the donor can demonstrate that the conservation purpose is protected in perpetuity without subordination of the mortgagee's rights.

(3) Remote future event.--A deduction shall not be disallowed under * * * this section merely because the interest which passes to, or is vested in, the donee organization may be defeated by the performance of some act or the happening of some event, if on the date of the gift it appears that the possibility that such act or event will occur is so remote as to be negligible.  See paragraph (e) of § 1.170A-1.  For example, a state's statutory requirement that use restrictions must be rerecorded every 30 years to remain enforceable shall not, by itself, render an easement nonperpetual.

* * * * * * *

(6) Extinguishment.--(i) In general.--If a subsequent unexpected change in the conditions surrounding the property that is the subject of a donation under this paragraph can make impossible or impractical the continued use of the property for conservation purposes, the conservation purpose can nonetheless be treated as protected in perpetuity if the restrictions are extinguished by judicial proceeding and all of the donee's proceeds (determined under paragraph (g)(6)(ii) of this section) from a subsequent sale or exchange of the property are used by the donee organization in a manner consistent with the conservation purpose of the original contribution.

(ii) Proceeds.--In case of a donation made after February 13, 1986, for a deduction to be allowed under this section, at the time of the gift the donor must agree that the donation of the perpetual conservation restriction gives rise to a property right, immediately vested in the donee organization, with a fair market value that is at least equal to the proportionate value that the perpetual conservation restriction at the time of the gift, bears to the value of the property as a whole at that time.  * * * For purposes of this

paragraph (g)(6)(ii), that proportionate value of the donee's property rights shall remain constant. Accordingly, when a change in conditions gives rise to the extinguishment of a perpetual conservation restriction under paragraph (g)(6)(i) of this section, the donee organization, on a subsequent sale, exchange, or involuntary conversion of the subject property, must be entitled to a portion of the proceeds at least equal to that proportionate value of the perpetual conservation restriction, unless state law provides that the donor is entitled to the full proceeds from the conversion without regard to the terms of the prior perpetual conservation restriction.

With our understanding of the origins of section 170(h)(5)(A) and its relevant legislative history and regulatory interpretation in mind, we now return to the question of whether the donated property was protected in perpetuity. Respondent argues that the conservation purpose of the donated property is not protected in perpetuity because NAT was not guaranteed a proportionate share of proceeds in the event of a casualty or condemnation before the mortgage held by First Republic Bank was satisfied.[12] Petitioner argues that the terms of the deed of easement and New York law guarantee NAT's right to receive a proportionate share of future proceeds in the event of a casualty or condemnation and that section 1.170A-14(g)(6)(ii), Income Tax Regs., is therefore satisfied. We agree with respondent.

We recently decided whether taxpayers were entitled to a deduction for the claimed charitable contribution of an easement

---

[12]Respondent does not assert that LLC failed to meet the subordination requirement of sec. 1.170A-14(g)(2), Income Tax Regs.

under similar facts in <u>Kaufman v. Commissioner</u>, 134 T.C. 182 (2010) (Kaufman I). In Kaufman I, the taxpayers contributed to a donee organization a facade easement on a single-family rowhouse which they owned in a historic preservation district in Boston. At the time of contribution, the property was subject to a mortgage which entitled the mortgagee to a "prior claim" to all proceeds of condemnation and to all insurance proceeds resulting from any casualty of the property. The taxpayers claimed a charitable contribution deduction equal to the value they assigned to the facade easement, and the Commissioner disallowed that deduction.

In Kaufman I the Commissioner moved for summary judgment, and we granted that motion insofar as it related to the deductibility of the contribution of the easement. We held as a matter of law that the facade easement was not protected in perpetuity because the donee organization was not guaranteed a proportionate share of proceeds in the event of casualty or condemnation as required by section 1.170A-14(g)(6)(ii), Income Tax Regs. We noted that the taxpayers could not avoid the unconditional requirement that the donee organization "must" be entitled to its proportionate share of future proceeds by showing that they would most likely be able to satisfy their mortgage and

their obligations to the donee organization.[13]  We believe our Opinion in Kaufman I to be squarely on point.

As in Kaufman I, the lender agreement here is clear that First Republic Bank retained a "prior claim" to all condemnation and insurance proceeds "in preference" to NAT "until" that mortgage was satisfied and discharged.  Thus, at any point before the mortgage was repaid, the possibility existed for First Republic Bank to deprive NAT of value that should have otherwise been dedicated to the conservation purpose.  Such would be the case, for example, if the servient property was substantially or completely destroyed and no significant value remained in that property after the mortgage was satisfied.  Under such circumstances, the right of NAT to a proportionate share of the future proceeds of a condemnation or casualty would not be guaranteed.  LLC's contribution of the donated property thus fails to comply with the enforceability in perpetuity requirements of section 1.170A-14(g)(6)(ii), Income Tax Regs.  We find that LLC's contribution was not protected in perpetuity and therefore not a qualified conservation contribution under section 170(h)(1).

Petitioner argues that notwithstanding the mortgage on the property, the conservation purpose of the donated property is

---

[13]The taxpayers moved the Court to reconsider our grant of partial summary judgment, a motion which we denied in Kaufman v. Commissioner, 136 T.C. __ (2011) (Kaufman II).

also protected in perpetuity under New York law.  Petitioner relies on N.Y. Real Prop. Acts. Law sec. 1951(2) (McKinney 2008), which petitioner believes "requires" that NAT be compensated before the easement may be extinguished.  We are not persuaded. N.Y. Real Prop. Acts. Law sec. 1951(2) authorizes a New York court to extinguish an easement where the easement "is of no actual and substantial benefit to the persons seeking its enforcement or seeking a declaration or determination of its enforceability, * * * [because] by reason of changed conditions or other cause, its purpose is not capable of accomplishment, or for any other reason".  That section further provides that an easement adjudged unenforceable shall be "completely extinguished" upon payment of damages, if any, which the person entitled to enforce the easement would sustain from the extinguishment of that easement.

Petitioner argues that LLC has satisfied the requirement of section 1.170A-14(g)(6)(ii), Income Tax Regs., because a New York court "may" adjudge the facade easement unenforceable, entitling the beneficiary of the easement to compensation.  See N.Y. Real Prop. Acts. Law sec. 1951(2).  But as we have discussed above and in Kaufman I and II, section 1.170A-14(g)(6)(ii), Income Tax Regs., requires that NAT "must" be entitled to its proportionate share of proceeds in the event the easement is extinguished. Petitioner cannot avoid the unconditional requirement of section

1.170A-14(g)(6)(ii), Income Tax Regs., by showing that a New York court might adjudge the facade easement unenforceable, especially where, as here, petitioner has not established that NAT would sustain or recover actual damages in the event of extinguishment.

B.    Section 170(h)(4)

We are also not convinced that the donated property satisfies the requirements of section 170(h)(4).  Under section 170(h)(4)(A)(iv), a contribution is for a conservation purpose if it preserves a historically important land area or a certified historic structure.  See Glass v. Commissioner, 124 T.C. at 277-278; see also sec. 1.170A-14(d)(1), Income Tax Regs.  A "certified historic structure" includes a building which is in a registered historic district and is certified by the Secretary of the Interior as being of historic significance to the district.  Sec. 1.170A-14(d)(5)(iii), Income Tax Regs.  The subject property is a "certified historic structure" because it is within the Metropolitan Museum Historic District and was certified as such by the U.S. Department of the Interior National Park Service.  Petitioner's entitlement to a deduction for a contribution of the donated property, therefore, depends on whether the transfer of the donated property in fact preserved the subject property.  See Herman v. Commissioner, T.C. Memo. 2009-205.

By virtue of its location in the Metropolitan Museum Historic District, New York City law makes it unlawful for LLC to

alter the subject property unless LPC approves that alteration. N.Y. City Admin. Code sec. 25-305(a)(1) (2002). In determining whether to allow such an alteration, the LPC must consider whether the alteration would "change, destroy or affect any exterior architectural feature" of the subject property and, in the case of an improvement, "whether such construction would affect or not be in harmony with the external appearance of other, neighboring improvements". Id. sec. 25-306(a)(1). This determination would of course consider not only the external appearance of the subject property's facade but also the ability of LLC to alter the aesthetics of the subject property by building above it. Thus it is local law and the rules of the LPC that preserve the subject property and not the rights which NAT possessed under the deed of easement. See Herman v. Commissioner, supra. While petitioner argues that NAT's enforcement of the deed of easement affords additional meaningful protection not already guaranteed by the LPC's enforcement of local law, petitioner has failed to persuade us that such is the case.

C.    Conclusion

We hold that LLC's contribution of the donated property does not comply with the requirements of section 170(h)(4) and (5). Accordingly, LLC's contribution of the donated property was not made "exclusively for conservation purposes", see sec. 170(h)(1),

and LLC is not entitled to its claimed noncash charitable contribution deduction under section 170(f)(3)(B)(iii).[14]

III.  Accuracy-Related Penalty

Respondent determined that a 20-percent accuracy-related penalty under section 6662(a) applies to any underpayment of tax attributable to the $6,570,000 disallowance.  Respondent determined that the accuracy-related penalty was appropriate because of negligence or disregard of rules or regulations, or alternatively, because of a substantial understatement of income tax.  See sec. 6662(b)(1) and (2), (c), (d).  Respondent bears the burden of production on the applicability of this accuracy-related penalty in that he must come forward with sufficient evidence indicating that it is proper to impose it.  See sec.

---

[14]Respondent also determined that LLC did not properly substantiate its claimed deduction for the noncash contribution because none of the Haims appraisals were "qualified appraisals" within the meaning of sec. 170(f)(11)(E) and sec. 1.170A-13(c)(3), Income Tax Regs.  To that end, respondent states that the 2004 appraisal was prepared more than 60 days before the date of contribution; the 2004 and 2005 appraisals did not value the donated property as of the date of the contribution; and the 2009 appraisal was obtained long after the due date (including extensions) of the return on which the deduction was claimed.  We agree with this determination.  Sec. 170(f)(11)(D) requires that a "qualified appraisal" be attached to the tax return reporting a noncash contribution of more than $500,000, and LLC did not meet this requirement for the reasons stated by respondent as to this issue.  We add that the appraisals also failed to be "qualified appraisals" for the reasons set forth in Scheidelman v. Commissioner, T.C. Memo. 2010-151.  Whereas petitioner relies upon the doctrine of substantial compliance to offset petitioner's noncompliance with any applicable requirement for characterizing an appraisal as a "qualified appraisal", we do not do so.  See id.

7491(c); see also Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once respondent meets this burden, the burden of proof remains with petitioner, including the burden of proving that the penalty is inappropriate because of reasonable cause.  See Higbee v. Commissioner, supra at 446-447.  The facts of this case lead us to conclude that respondent has met his burden of production with respect to the accuracy-related penalty.

Petitioner argues that the accuracy-related penalty does not apply because LLC meets the reasonable cause defense of section 6664(c)(1).  Pursuant to that section, the 20-percent accuracy-related penalty of section 6662(a) does not apply to any portion of an underpayment for which petitioner establishes that LLC, through Mr. Asser:  (1) Had reasonable cause; and (2) acted in good faith.[15]  Whether Mr. Asser acted with reasonable cause and in good faith turns on the extent to which he, in the light of his experience, knowledge, and education, tried to assess the proper tax treatment of the contribution of the donated property.  See sec. 1.6664-4(b)(1), Income Tax Regs.  Reasonable cause may exist where a position taken on a return involves an issue that was novel at the time the return was filed.  See Bunney v.

---

[15]We determine the application of this defense in this partnership-level proceeding because petitioner claims that the defense applies on account of the actions of Mr. Asser as LLC's managing member and tax matters partner.  See Whitehouse Hotel Ltd. Pship. v. Commissioner, 131 T.C. 112, 173 (2008), vacated and remanded on another issue 615 F.3d 321 (5th Cir. 2010); Tigers Eye Trading, LLC v. Commissioner, T.C. Memo. 2009-121; see also sec. 301.6221-1(c), Proced. & Admin Regs.

Commissioner, 114 T.C. 259, 266 (2000); Lemishow v. Commissioner, 110 T.C. 110, 114 (1998); cf. Van Camp & Bennion v. United States, 251 F.3d 862, 868 (9th Cir. 2001) ("Where a case is one 'of first impression with no clear authority to guide the decision makers as to the major and complex issues,' a negligence penalty is inappropriate." (quoting Foster v. Commissioner, 756 F.2d 1430, 1439 (9th Cir. 1985), affg. in part and vacating as to an addition to tax for negligence 80 T.C. 34 (1983))).

We agree with petitioner that Mr. Asser made a reasonable attempt to comply with the Internal Revenue Code and that he acted in good faith. We understand that Kaufman I is the first time that a court has considered the effect of a mortgage on a contribution of an easement claimed to be a qualified conservation contribution. That interpretation of the relevant regulation was not published until more than 4 years after Mr. Asser filed the 2004 return. We do not believe that the regulations interpreting the perpetuity requirement of section 170(h)(5) are so crystal clear and unambiguous as to make the imposition of the accuracy-related penalty appropriate. We also find that Mr. Asser acted in good faith by securing three separate appraisals of the donated property and disclosing the contribution of that property on LLC's 2004 return. See Rolfs v. Commissioner, 135 T.C. 471 (2010). Accordingly, in the light of all of the facts and circumstances, we find that Mr. Asser acted

reasonably and in good faith and hold that LLC is not liable for an accuracy-related penalty under section 6662(a).

IV.  Conclusion

We have considered all arguments made by petitioner for a contrary holding as to the deficiency, and we have considered all arguments made by respondent for a contrary holding as to the accuracy-related penalty.  To the extent that we have not discussed those arguments above, we have rejected them as moot, irrelevant, or without merit.

Decision will be entered for respondent as to the deficiency and for petitioner as to the accuracy-related penalty.