T.C. Memo. 2013-254

UNITED STATES TAX COURT

GEORGE GORRA AND LEILA GORRA, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15336-10.                    Filed November 12, 2013.

<u>Frank Agostino</u>, <u>Reuben Muller</u>, and <u>Jairo Cano</u>, for petitioners.[*]

<u>Marc L. Caine</u> and <u>Marissa J. Savit</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KERRIGAN, <u>Judge</u>:  This case involves a noncash charitable contribution

deduction.  Respondent determined the following tax deficiencies and penalties:[1]

---

[*]Brief amicus curiae was filed by <u>Miriam L. Fisher</u> and <u>Theodore J. Wu</u> as attorneys for Trust for Architectural Easements.

[1]Respondent concedes the portion of the penalty under sec. 6662(a) for tax

(continued...)

| [*2] Year | Deficiency | Penalties | |
|-----------|------------|-----------|--------------|
|           |            | Sec. 6662(a) | Sec. 6662(h) |
| 2006      | $79,252    | $15,853   | $26,743      |
| 2007      | 25,719     | 5,344     | 10,688       |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

After concessions we must consider (1) whether petitioners are entitled to a charitable contribution deduction under section 170 for the donation of a facade easement and (2) whether petitioners are liable for a gross valuation misstatement penalty pursuant to section 6662(h) or, in the alternative, for an accuracy-related penalty pursuant to section 6662(a).

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners resided in New York when they filed the petition.

---

[1](...continued)
year 2006 that relates to petitioners' cash contribution. The amount of the penalty under sec. 6662(a) that is still in issue for 2006 is $13,372.

[*3]   Petitioner husband graduated from the University of Pennsylvania Wharton School of Business where he received a bachelor of science degree in economics. Petitioner husband attended the New York University Stern School of Business graduate program for one year.  For approximately 30 years petitioner husband has been involved with commercial real estate transactions in Manhattan.  Petitioner husband has also maintained an interest in architecture from the Victorian period for many years.  Petitioner wife practiced as a tax attorney with Mobil Oil from 1978 to 1981.  Thereafter, petitioner wife left her position as a tax attorney and worked full time raising petitioners' children.

The Property

On May 17, 1993, petitioners purchased a townhouse at Block 1520, Lot 9 in the borough of Manhattan with a street address on East 91st Street, New York, New York (property).  The property is in the Carnegie Hill Historic District of New York City.  The property is a single-family residence with four stories; it is 15 feet wide and approximately 3,300 square feet.[2]  The lot is approximately 1,500 square feet.  Petitioners owned the property at all relevant times.  On December 18, 2006, and at all times relevant, there was no mortgage on the property.

---

[2]The tax record shows square footage of 3,300.  Respondent's expert contends the square footage is 3,240.

[*4]  In March 2006 a real estate agency listed the property for sale at $5,800,000.  Petitioners reduced the price to $5,575,000 on June 23, 2006.  On September 19, 2006, petitioners further reduced the price to $5,295,000.  The property was taken off the market in March 2007.

On or about January 11, 2007, the National Park Service certified that the property contributes to the significance of the Carnegie Hill Historic District and is a "certified historic structure" for a charitable contribution for conservation purposes in accordance with the Tax Treatment Extension Act of 1980, Pub. L. No. 96-541, sec. 6(b), 94 Stat. at 3207.  The property is not classified as "sound, first-class condition".

The Easement

On December 18, 2006, petitioners executed a conservation deed of easement (deed) with the Trust for Architectural Easements (Trust), which was known at the time as the National Architectural Trust (NAT).[3]  Among other things, the deed grants the Trust the right to enter and inspect petitioners' property, including granting access through the interior of the building.  On December 20, 2006, petitioners also made a $45,000 cash contribution to the

---

[3]We refer to the organization as "the NAT" when discussing the organization before its name change and as "the Trust" when discussing the organization after its name change.

[*5] Trust.[4]  On December 26, 2006, a representative of the Trust executed the deed on behalf of the Trust.

At all times relevant the Trust was a nonprofit organization exempt from taxation pursuant to section 501(c)(3).  For the purposes of this case the Trust is a "qualified organization" within the meaning of section 170(h)(3).

The primary mission of the Trust is to encourage participation in the voluntary historic preservation program funded by the Federal Government with the Federal Tax Incentive Program.  The Trust also engages in additional preservation activities that relate to historic architecture.  The Trust monitors the properties where it holds easements by sending employees to visit the properties. The Trust employs three people to monitor 550 properties.  Trust employees inspect visually the properties.  During these annual inspections Trust employees also photograph the properties.  The Trust uploads the resulting pictures and notes onto a server and compares the pictures to images from previous years to determine whether there are changes to the property.

If Trust employees find a violation through their inspection process, the deed gives the Trust the right to institute legal proceedings to procure an

---

[4]For tax year 2006 respondent allowed a cash charitable contribution deduction of $44,300 for petitioners' payment to the NAT.  There is no indication in the record that the remaining $700 is still in issue.

**[*6]** injunction against violations of the deed. The deed also gives the Trust the right to enter the property to correct any violations and then place a lien on the property for the cost of such repairs.

Before 2006 Springfield Management Services (SMS) performed services for the Trust. SMS did not perform services for the Trust while the Trust held an easement for the property.

The Deed

The terms of the deed, in pertinent part, include the following:

*       *       *       *       *       *       *

E. Grantor [petitioners] desires to grant to the Grantee [the NAT], and the Grantee desires to accept an Open Space and Architectural Facade Conservation Deed of Easement (the Easement) on the Property, exclusively for conservation purposes.

F. It is the intent of the parties that the facades of the improvements located on the Property (the "Building"), including the existing facades on the front, sides and rear of the Building and the measured height of the Building (collectively the "Protected Facades"), are protected by this Easement so that any change to the Protected Facades shall require prior express written approval by the Grantee, which may be withheld or conditioned in its sole discretion, and shall be consistent with the historical character of the Building exterior, as required under applicable federal, state and local laws.
* * *

II

The Grantor does hereby grant and convey to the Grantee, TO HAVE AND TO HOLD, an Easement in gross, in perpetuity, in, on, and to

**[\*7]** the Property, the Building and the Protected Facades, being an Open Space and Architectural Facade Conservation Deed of Easement on the Property \* \* \*.

A.  Without the express written consent of the Grantee, \* \* \* Grantor will not undertake \* \* \* with respect to those parts of the Protected Facades:

     1.  any alteration, construction or remodeling of existing exterior improvements on the Protected Facades, or the placement thereon \* \* \* [or]

     2.  any exterior extension of existing improvements on the Property, or the erection of any new or additional exterior improvements on the property or in the open space above or surrounding the existing improvements.

     \*      \*      \*      \*      \*      \*      \*

III

A.  The Grantee \* \* \* shall have \* \* \* the following rights:

     1.  at reasonable times and upon reasonable notice, the right to enter upon and inspect the Protected Facades and any improvements thereon. \* \* \*

     2.  in the event of a violation of the Easement and Grantor's failure to cure, \* \* \* such violation within fifty (50) business days following Grantor's receipt of Grantee's written notice of such violation:

          (a) the right to institute legal proceeding to enjoin such violation by temporary, and/or permanent injunction, to require the restoration of the Property or the improvements thereon, including the Protected Facades, and open space, to their prior condition; to be reimbursed by Grantor for all related

**[*8]** reasonable costs and attorney's fees; and to avail itself of all other legal and equitable remedies.

\*   \*   \*   \*   \*   \*   \*

IV

A.  This Easement is binding not only upon Grantor but also upon its successors, heirs and assigns and all other successors in interest to the Grantor, and shall continue as a servitude running in perpetuity with the land.  This Easement shall survive any termination of Grantor's or the Grantee's existence.  The Rights of the Grantee under this instrument shall run for the benefit of and may be exercised by its successors and assigns, or by its designees duly authorized in a deed of Easement.

B.  Grantee covenants and agrees that it will not transfer, assign or otherwise convey its rights under this Easement except to another "qualified organization" described in Section 170(h)(3) of the Internal Revenue Code of 1986 and controlling Treasury regulations, and Grantee further agrees that it will not transfer this Easement unless the transferee first agrees to continue to carry out the conservation purposes for which this Easement was created, provided, however, that nothing herein contained shall be construed to limit the Grantee's right to give its consent (e.g., to changes in a Protected Facades [sic]) or to abandon some or all of its rights hereunder.

C.  In the event this Easement is ever extinguished through a judicial decree, Grantor agrees on behalf of itself, its heirs, successors and assigns, that Grantee, or its successors and assigns, will be entitled to receive upon the subsequent sale, exchange or involuntary conversion of the Property, a portion of the proceeds from such sale, exchange or conversion equal to the same proportion that the value of the initial Easement donation bore to the entire value of the property at the time of donation as estimated by a state licensed appraiser, unless controlling state law provides that the Grantor [petitioners] is entitled to the full proceeds in such situations, without regard to the

[*9] Easement. Grantee agrees to use any proceeds so realized in a manner consistent with the conservation purposes of the original contribution.

New York City Landmarks Preservation Commission

The New York City Landmarks Preservation Commission (LPC) is the New York City agency responsible for identifying and designating the city's landmarks and buildings in the city's historic districts. The LPC regulates changes to designated buildings. The LPC consists of 11 Commissioners and approximately 50 full-time staff members, including architects, architectural historians, and restoration specialists. The LPC is responsible for the preservation of 26,000 structures and had a staff of four employees responsible for inspection during relevant times.

New York City Landmarks Law

New York City adopted its Landmarks Preservation Law (Landmarks Law) in 1965 in response to concerns about the destruction of buildings with significant historical, architectural, and cultural value. Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 108-109 (1978); see N.Y. City Admin. Code sec. 25-303. The Landmarks Law was enacted in order to safeguard New York City's historic, aesthetic, and cultural heritage; help stabilize and improve property values in historic districts; encourage civic pride in the beauty and accomplishments of the

[*10] past; protect and enhance the city's attractions for tourists; strengthen the city's economy; and promote the use of landmarks for the education, pleasure, and welfare of the people of New York City.

Petitioners' property is subject to the Landmarks Law, which requires property owners to keep designated properties in good repair and to obtain an LPC permit before starting work if the work will affect a landmark's exterior or if the work requires a Department of Buildings permit. Violations of the Landmarks Law occur either when work is performed on a landmark without a permit or when work does not comply with a permit. The Landmarks Law provides, in pertinent part:

> In making * * * [a] determination with respect to * * * [an] application for a permit to construct, reconstruct, alter or demolish an improvement in an historic district, the commission shall consider (a) the effect of the proposed work in creating, changing, destroying or affecting the exterior architectural features of the improvement upon which such work is to be done, and (b) the relationship between the results of such work and the exterior architectural features of other, neighboring improvements in such district.

N.Y. City Admin. Code sec. 25-307(b)(1). The Landmarks Law further provides: "[The commission is not authorized] to regulate or limit the height and bulk of buildings, [or] to regulate and determine the area of yards, courts and other open

**[*11]** spaces". N.Y. City Admin. Code sec. 25-304(a). The Landmark Law

defines "exterior architecture feature" as:

> [t]he architectural style, design, general arrangement and components of all of the outer surfaces of an improvement, as distinguished from the interior surfaces enclosed by said exterior surfaces, including, but not limited to, the kind, color and texture of the building material and the type and style of all windows, doors, lights, signs and other fixtures appurtenant to such improvement.

N.Y. City Admin. Code sec. 25-302(g).

The task of administering the law was given to the LPC. Penn Cent. Transp.

Co., 438 U.S. at 110; see N.Y.C. Charter ch. 74, sec. 3020. The LPC is

responsible for identifying and designating New York City's landmarks and the

buildings in the city's historic districts, including the Carnegie Hill District. The

LPC also regulates changes to designated buildings, including petitioners'

property. Since July 1998 when the Landmark Protection Bill became effective,

the LPC has had the power to seek civil fines for violations of its regulations and

to seek criminal penalties (fines and imprisonment) and injunctive relief. N.Y.

City Admin. Code secs. 25-317 and 25-317.1.

The LPC does not monitor yearly each of the structures in its jurisdiction.

The LPC does not photograph each structure and does not compare the annual

photograph of the previous year. In order to track violations, the LPC uses

[*12] referrals from sources other than its staff. The LPC receives approximately 800 to 1,000 reports of violations each year. In 2006 and 2007 the LPC retained four employees who were responsible for the enforcement and preservation of approximately 26,000 structures in New York City.

Haims Appraisal

On December 18, 2006, petitioners obtained an appraisal of their property for tax purposes from Jerome Haims Realty, Inc. The NAT provided petitioners with Eric Haims' name, along with the name of one other appraiser, and advised that Mr. Haims is a preapproved appraiser of conservation easements. Petitioners paid Jerome Haims Realty, Inc., $3,000 for Mr. Haims' appraisal services.

Mr. Haims, who is a qualified appraiser as defined in section 1.170A-13(c)(5), Income Tax Regs., appraised the easement that petitioners donated to the NAT. Mr. Haims prepared an appraisal report that included a description of petitioners' property and estimated the fair market value of the easement donated to the NAT. The appraisal valued the donated property as of December 11, 2006.

The appraisal described petitioners' property as 3,300 square feet of gross living area (as per New York City records), and 15 feet of frontage on the north side of East 91st Street by 100 feet 8½ inches of depth, containing 1,515 square feet of lot area. The appraisal stated that although the property was listed for sale

[*13] on the market at an asking price of $5,295,000, on the basis of Mr. Haims'

analysis the property's market value[5] was actually $5,500,000.

The Haims appraisal used the sales comparison approach and determined

the market value of the property before the donation of the easement. The

appraisal established the diminution of the value of the easement reflected as a

percentage of the "before" market value of the property. Mr. Haims conducted a

market study using paired sales data of residential properties in New York. The

appraisal stated that on the basis of the data and analysis presented, the value of

the historic preservation easement was equal to 11% of the property's market

value, or $605,000.

Recording the Deed

After signing the easement deed on December 18, 2006, petitioners

entrusted the Trust to record it. On December 26, 2006, the vice president of the

Trust executed the deed on behalf of the Trust. On December 28, 2006, the Trust

delivered the deed to the New York City Department of Finance, Office of the

Register (city register). The Trust also paid the city register $122 for recording

fees and taxes.

---

[5]As discussed below, although Mr. Haims used the term "market value" in his appraisal, he determined the property's fair market value.

**[*14]** The cover sheet for the recording forms that were presented to the city register, however, contained an error: The property's street number was incorrectly listed on the cover sheet. Because the address on the cover sheet did not match the address on the deed, the city register requested that the Trust resubmit the deed with the discrepancy resolved. The Trust resubmitted the deed in January 2007 to correct the discrepancy. The deed was recorded by the city register on January 18, 2007.

Inspection of the Property by the Trust

On October 18, 2007, the Trust sent petitioners a letter informing them that the inspector noted no alteration had been made to their property and the inspection was done on May 11, 2007. The letter reminded petitioners that "the exterior of the Property may not be altered legally without the prior approval of the Trust".

On November 22, 2007, petitioners notified the Trust in writing that they wanted to replace the rear windows. The Trust approved the changes on December 24, 2007.

On March 2, 2008, petitioners received a letter from the Trust informing them that their property would be inspected in spring 2008. On August 7, 2008, the Trust sent petitioners a letter informing them that the inspector noticed that no

[*15] alterations had been made since the last inspection and the property appeared to be in good repair.

On February 13, 2009, the Trust sent petitioners a letter stating that the property would be visited during spring 2009. On May 20, 2009, the Trust inspected the property. On November 17, 2009, the Trust sent petitioners a letter which stated that the window replacement at the rear facade was consistent with the approved plan and that the Trust had no objection.

The November 17, 2009, letter also noted that petitioners had installed a retractable awning. The Trust reminded petitioners that making alterations without its written consent was a violation of the easement and that if there were any unauthorized alterations inconsistent with the historic character of the property, petitioners would be required to restore the property to its prior condition. The Trust, however, determined that the awning was consistent with the historical character of the property.

Tax Returns

A certified public accountant prepared petitioners' 2006 and 2007 Federal income tax returns. Petitioners timely filed both tax returns.

Petitioners filed a Form 8283, Noncash Charitable Contributions, with their 2006 Federal income tax return and reported a noncash charitable contribution of

**[*16]** $605,000 for the donation of the facade easement to the NAT. Petitioners

then deducted $238,778 of their 2006 reported noncash charitable contribution.

For 2007 petitioners deducted a noncash charitable contribution carryforward of

$68,456.

Notice of Deficiency

On April 8, 2010, respondent issued the notice of deficiency to petitioners

for tax years 2006 and 2007, disallowing the noncash charitable contribution

deductions petitioners claimed on their 2006 and 2007 income tax returns. The

notice of deficiency also determined that petitioners were liable for the gross

valuation misstatement penalty under section 6662(h) or, in the alternative, the

accuracy-related penalty under section 6662(a). In response, petitioners filed a

petition.

OPINION

Generally, the Commissioner's determinations in a notice of deficiency are

presumed correct, and the taxpayer bears the burden of proving, by a

preponderance of the evidence, that those determinations are incorrect. Rule

142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Tax deductions are a

matter of legislative grace, and a taxpayer has the burden of proving his or her

[*17] entitlement to a deduction.  INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934).

Section 7491(a)(1) provides an exception that shifts the burden of proof to the Commissioner as to any factual issue relevant to a taxpayer's liability for tax if (1) the taxpayer introduces credible evidence with respect to the issue, sec. 7491(a)(1); and (2) the taxpayer satisfies certain other conditions, including substantiation of any item and cooperation with the Government's requests for witnesses and information, sec. 7491(a)(2); see also Rule 142(a)(2).  Petitioners and respondent stipulated that petitioners met the specifications of section 7491(a)(2)(B) with respect to "cooperat[ing] with reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews".

Petitioners contend that because they also introduced credible evidence establishing both compliance with the technical provisions of section 170 and the value of the easement, the burden should shift to respondent under section 7491(a)(1).  Credible evidence is evidence that the Court would find sufficient upon which to base a decision on the issue in favor of the taxpayer if no contrary evidence were submitted.  Rendall v. Commissioner, T.C. Memo. 2006-174, aff'd, 535 F.3d 1221 (10th Cir. 2008); see Higbee v. Commissioner, 116 T.C. 438, 442-443 (2001).  Petitioners did not produce evidence that meets the definition of

[*18] "credible evidence" as used in section 7491(a)(1). We find that petitioners have not shown that they meet the specifications of section 7491(a) to shift the burden of proof to respondent as to the remaining relevant factual issues. The burden of proof remains with petitioners.

I.      Noncash Charitable Contributions

A deduction is allowed for any charitable contribution for which payment is made within the taxable year if the contribution is verified under regulations prescribed by the Secretary. Sec. 170(a)(1). Generally, a charitable contribution deduction is not allowed for a charitable gift of property consisting of less than the donor's entire interest in that property. Sec. 170(f)(3)(A). Section 170(f)(3)(B)(iii), however, provides an exception for a "qualified conservation contribution". Section 170(h)(1) defines a qualified conservation contribution as follows:

> SEC. 170(h). Qualified Conservation Contribution.--
>
> (1) In general.-- For purposes of subsection (f)(3)(B)(iii), the term "qualified conservation contribution" means a contribution--
>
> (A) of a qualified real property interest,
>
> (B) to a qualified organization,
>
> (C) exclusively for conservation purposes.

**[\*19]** All three requirements must be met for a donation to be a qualified conservation contribution. Simmons v. Commissioner, T.C. Memo. 2009-208, slip op. at 9, aff'd, 646 F.3d 6 (D.C. Cir. 2011). The legislative history underlying section 170(h) indicates the policy behind the qualified conservation contribution exception and its restrictions:

> The committee believes that the preservation of our country's natural resources and cultural heritage is important, and the committee recognizes that conservation easements now play an important role in preservation efforts. The committee also recognizes that it is not in the country's best interest to restrict or prohibit the development of all land areas and existing structures. Therefore, the committee believes that provisions allowing deductions for conservation easements should be directed at the preservation of unique or otherwise significant land areas or structures. * * *

S. Rept. No. 96-1007, at 9 (1980), 1980-2 C.B. 599, 603.

Section 170(f)(11) further provides that no charitable contribution deduction shall be allowed under section 170(a) for any contribution of property for which a deduction of more than $5,000 is claimed unless the taxpayer obtains a qualified appraisal of the property. Sec. 170(f)(11)(A), (C). For contributions of property for which a deduction of more than $500,000 is claimed, the taxpayer must also attach the qualified appraisal of the property to his or her Federal tax return. Sec. 170(f)(11)(D).

[*20] The parties agree that the Trust was at all relevant times an organization exempt from Federal taxation under section 501(c)(3) and a qualified organization under section 170(h)(1)(B), as defined by section 170(h)(3). The parties do not dispute that petitioners properly attached an appraisal (qualified or not) to their Federal income tax return as specified by section 170(f)(11)(D).

Therefore, we must determine (1) whether petitioners' easement contribution was a qualified real property interest, as defined by section 170(h)(2); (2) whether petitioners' easement contribution was made exclusively for conservation purposes, as defined by section 170(h)(4) and (5); and (3) whether the Haims appraisal was a qualified appraisal under section 170(f)(11)(C). We must also determine the value of the easement contribution.

A.    Qualified Real Property Interest

For purposes of section 170(h)(2)(C) the term "qualified real property interest" includes "a restriction (granted in perpetuity) on the use which may be made of the real property." A restriction granted in perpetuity on the use of the property must be based on legally enforceable restrictions that will prevent uses of the retained interest in the property that are inconsistent with the conservation purposes of the contribution. See sec. 1.170A-14(g)(1), Income Tax Regs.

[*21]   We addressed the issue of what constitutes a "qualified real property interest" in Belk v. Commissioner, 140 T.C. 1, 7 (2013).  In Belk the taxpayers donated a conservation easement; in the conservation easement agreement they agreed not to develop land on a golf course.  The conservation easement agreement, however, permitted the taxpayers to remove portions of the golf course from the conservation easement and replace them with property currently not subject to the conservation easement.  We found that the use restriction was not granted in perpetuity because the conservation easement agreement permitted the taxpayers to change what property was subject to the conservation easement.  Id. at 10.  We noted that the taxpayers did not agree never to develop the golf course. Id. at 10-11.  We thus held that the taxpayers failed to donate an interest in real property which was subject to a use restriction granted in perpetuity.  Id. at 11. We stated:  "To conclude otherwise would permit petitioners a deduction for agreeing not to develop the golf course when the golf course can be developed by substituting the property subject to the conservation easement."  Id.

Unlike the conservation easement agreement in Belk petitioners' deed clearly defines the property donated under the easement and restricts the easement to that property.  The deed includes an exhibit with the legal description of the land and the boundaries of petitioners' property, which is also a matter of public

[*22] record. The deed provides that "the facades of the improvements located on the Property (the 'Building'), including the existing facades on the front, sides and rear of the Building and the measured height of the Building (collectively the 'Protected Facades'), are protected by this Easement." To prevent any ambiguity and clearly define the easement rights, the deed provides that "[w]ritten descriptions and photographs of the Protected Facades * * * shall control." The boundaries of the property are clear, and the easement clearly relates to the front, sides, rear, and measured height of the building; no substitution is allowed.

In addition, the deed grants "an Easement in gross, in perpetuity, in, on, and to the Property". It further states: "This Easement is binding not only upon Grantor, but also upon its successors, heirs and assigns and all other successors in interest to the Grantor, and shall continue as a servitude running in perpetuity with the land." The deed mandates specifically that the Trust will not transfer, assign, or otherwise convey its rights under the easement unless it is to a qualified organization under section 170(h)(3) and the transferee agrees to continue to carry out the conservation purposes for which the easement was created.

Accordingly, we hold that petitioners' easement contribution was a qualified real property interest.

**[\*23]**     B.     <u>Exclusively for Conservation Purposes</u>

1.     <u>Valid Conservation Purpose</u>

Section 170(h)(4)(A)(iv) provides, in pertinent part, that a valid conservation purpose is the preservation of a historically important land area or a certified historic structure.

Section 170(h)(4)(C) defines the phrase "certified historic structure" as (i) any building, structure, or land, which is listed in the National Register, or (ii) any building that is located in a registered historic district (as defined in section 47(c)(3)(B)) and is certified by the Secretary of the Interior to the Secretary of the Treasury as being of historic significance to the district.  For this purpose, a structure means any structure, whether or not it is depreciable; accordingly, easements on private residences may qualify.  Sec. 1.170A-14(d)(5)(iii), Income Tax Regs.

The enactment of the Pension Protection Act of 2006 (PPA), Pub. L. No. 109-280, 120 Stat. 780, created additional requirements under section 170(h)(4)(B) for any contribution of property in a registered historic district.  PPA sec. 1213(a)(1), 120 Stat. at 1075.  Section 170(h)(4)(B) provides:

> (B) Special rules with respect to buildings in registered historic districts.--In the case of any contribution of a qualified real property interest which is a restriction with respect to the exterior of a building

[*24] described in subparagraph (C)(ii), such contribution shall not be considered to be exclusively for conservation purposes unless--

(i) such interest--

(I) includes a restriction which preserves the entire exterior of the building (including the front, sides, rear, and height of the building), and

(II) prohibits any change in the exterior of the building which is inconsistent with the historical character of such exterior, * * *

With respect to section 170(h)(4)(B) the General Explanation of Tax Legislation Enacted in the 109th Congress prepared by the Staff of the Joint Committee on Taxation states as follows:

A charitable deduction is allowable with respect to buildings (as is the case under present law) but the qualified real property interest that relates to the exterior of the building must preserve the entire exterior of the building including the space above the building, the sides, the rear, and the front of the building. In addition, such qualified real property interest must provide that no portion of the exterior of the building may be changed in a manner inconsistent with the historical character of such exterior.

Staff of J. Comm. on Taxation, General Explanation of Tax Legislation Enacted in the 109th Congress 590 (J. Comm. Print 2007).[6]

_____

[6]Taxpayers who make a donation in excess of $10,000 also must pay a $500 fee to the Internal Revenue Service (IRS). Sec. 170(f)(13). This provision, however, did not go into effect until after petitioners made their contribution. See Pension Protection Act of 2006 (PPA), Pub. L. No. 109-280, sec. 1213(e)(3), 120

(continued...)

[*25] If restrictions to preserve a building or land area within a registered historic district permit future development on the site, a deduction will be allowed only if the terms of the restrictions require that such development conform with appropriate local, State, or Federal standards for construction or rehabilitation within the district. Sec. 1.170A-14(d)(5)(i), Income Tax Regs. In general, a facade easement is a restriction the purpose of which is to preserve certain architectural, historic, and cultural features of the facade, or front, of a building. The terms of a facade easement might permit the property owner to make alterations to the facade of the structure if the property owner obtains consent from the qualified organization that holds the easement. This Court has held that a facade easement may constitute a qualifying conservation contribution. See Hilborn v. Commissioner, 85 T.C. 677 (1985).

Respondent contends that the conservation purpose requirement of section 170(h)(4) is not met because the easement does not preserve the property beyond what is already required under local law. By virtue of the property's location in Carnegie Hill Historic District, petitioners' property is subject to the Landmarks Law. Petitioners are thus required to keep the property in good repair and to

_____

[6](...continued)
Stat. at 1076 (noting that the provision applies to contributions made 180 days after August 17, 2006, the date of the PPA's enactment).

[*26] obtain an LPC permit before starting work if the work will affect the property's exterior or if the work requires a Department of Buildings permit.

Petitioners contend that their easement meets the conservation requirement and that the examination of local preservation law is part of the valuation process. See Hilborn v. Commissioner, 85 T.C. at 689. Petitioners argue that their easement is different from easements in prior cases before the Court because their easement is more than a facade easement; it is a full envelope easement. They contend that their easement is more restrictive than existing local laws and reduces development potential. Petitioners provide examples of properties for which the LPC approved a rear addition.

Petitioners' property is a certified historic structure within the meaning of section 170(h)(4)(A)(iv) because it is in a registered historic district and was certified as such by the Secretary of the Interior through the National Park Service in response to petitioners' request on January 11, 2007.

The easement at issue preserves petitioners' property as a certified historic structure. We find that the easement was more restrictive than the Landmarks Law.

The Landmarks Law mandates that petitioners obtain approval from the LPC before making changes to their property, while the deed imposes certain

[*27] clearly defined restrictions and gives the Trust unlimited discretionary authority to approve or deny changes to petitioners' property. The LPC passively monitors changes to historic buildings, while the Trust actively monitors changes to historic buildings. The LPC relies heavily on complaints as part of its monitoring. The Trust performed annual inspections and kept records including photographs. When the LPC reviews a building, it looks at it from the perspective of the streetscape.

Approval from the LPC to make improvements to a property is based on a comparison of the surrounding historical properties. That means petitioners may be given authority from the LPC to make improvements to their property as long as their building remains consistent with the exterior architectural features of neighboring improvements.

The properties directly across the street from petitioners' building are five or more stories high while petitioners' property is only four stories above ground. If petitioners applied for a permit to build an additional story, there is a chance the LPC would allow petitioners to do so as long as the addition was consistent with the exterior architectural features of neighboring buildings. The deed, however, requires that improvements to the property involving the existing front, sides, rear, and height of the building need written approval from the Trust. There is a risk

[*28] that the Trust will deny an improvement. At trial an employee of the Trust testified that the approval process of the Trust was different from that of the LPC and that the Trust did not approve all projects that met the qualifications of the LPC.

The Landmarks Law states specifically that the LPC is not authorized to regulate or limit the height and bulk of buildings or to regulate and determine the area of yards, courts, or other open spaces. N.Y. City Admin. Code sec. 25-304(a). The Trust, with its unlimited discretion, may deny petitioners' request to make any changes to their home for any reason, while the LPC must follow specific guidelines in its decisionmaking. The Trust has the ultimate say in granting petitioners the right to make changes to their property. Petitioners, however, have the option of appealing a denied permit request with the LPC and changing the LPC's decision.

John Weiss, deputy counsel to the LPC, testified that in order for the LPC to review a change application for a covered property, both the property owner and the easement holder must sign the change application. If the easement holder refused to sign the change application, then the LPC would not approve it. Here, the easement holder was the Trust. Therefore, the LPC would require the Trust's approval before reviewing a change application for petitioners' property.

**[\*29]** Mr. Weiss also testified the LPC must obtain either the consent of the property owner or a court order to enter the premises of a covered property. The Trust, however, has the right to enter petitioners' property without a court order. The Trust's monitoring visits require an appointment because the Trust needs access to the property's backyard. The Trust thus places a larger burden on petitioners' property rights than the Landmarks Law.

The Court on several occasions has considered whether a conservation deed of easement was more or less restrictive than local law in order to determine whether a contribution was for conservation purposes.

In <u>1982 East, LLC v. Commissioner</u>, T.C. Memo. 2011-84, the taxpayer contributed a conservation easement deed for a townhouse in a historic district in New York City to the NAT. The deed of easement prohibited the taxpayer from altering the townhouse's facade without the written consent of the donee organization. In particular the deed prohibited the taxpayer from erecting "'any new or additional exterior improvements on the [subject] property or in the open space above or surrounding the * * * townhouse' without the express written consent of NAT." <u>Id.</u>, slip op. at 8. We observed that the LPC would need to approve any alteration made to the taxpayer's property. We further observed that in making its determination to approve an alteration, the LPC would consider

[*30] whether an alteration would "'change, destroy or affect any exterior architectural feature' of the subject property and, in the case of an improvement, 'whether such construction would affect or not be in harmony with the external appearance of other, neighboring improvements'." Id. at 26 (quoting N.Y. City Admin. Code sec. 25-306(a)(1)).

We found in 1982 East, LLC that the LPC's determination would consider the external appearance of the townhouse's facade and the ability of the taxpayer to alter the aesthetics of the subject property by building above it. Id. Consequently we found that the deed of easement in 1982 East, LLC was not more restrictive than the Landmarks Law, holding: "[I]t is local law and the rules of the LPC that preserve the subject property and not the rights which NAT possessed under the deed of easement." Id.

The deed in the instant case is more restrictive than the deed of easement in 1982 East, LLC. For instance petitioners' deed mentions specifically the rear of the building, while the deed of easement in 1982 East, LLC did not. This distinction constitutes a major difference in the rights already granted to the LPC under the Landmarks Law. Although both petitioners' deed and the LPC restrict improvements relating to the exterior of the building, it is unclear whether the LPC would limit changes to the rear of a property. Under the deed petitioners are

[*31] expressly restricted from making alterations to the rear of the building without approval. The LPC, however, is less restrictive: It focuses on how change to a property would affect the neighborhood.[7] This is a significant difference. We conclude that petitioners' easement is more restrictive than local law.

In Simmons v. Commissioner, T.C. Memo. 2009-208, the taxpayers granted facade easements via conservation easement deeds for two historic properties in Washington, D.C., to L'Enfant, a historical preservation commission similar to the Trust. The conservation easement deeds provided in effect that the taxpayers "could not make any material changes to the respective facades in any way without L'Enfant's consent." Id., slip op. at 4. The Court found that the deeds were more restrictive than local law and allowed the taxpayers section 170 deductions, stating:

> Even if we were to accept respondent's contention that the easements did not impose any restrictions on * * * [the taxpayer] over and above those imposed by the District of Columbia, the easements still added an additional level of approval before any changes could be made to the properties. * * * [The taxpayer] is required to obtain L'Enfant's

---

[7]The LPC further requires approval for "any significant modification of the existing bulk or envelope of a building". N.Y. City Admin. Code sec. 25-302(x)(1)(c). This language is likewise less restrictive than the language in petitioners' deed, which prohibits any alterations (significant or not) to the rear of the building without approval.

> **[*32]** consent to make any changes to the facades, even if those
> changes are allowable under District of Columbia preservation laws.

Id. at 26.  We thus concluded that the approval process alone was enough to differentiate rights granted under the deeds from those already in place under local law.

In Scheidelman v. Commissioner, T.C. Memo. 2013-18, the taxpayer contributed an architectural conservation facade easement for a townhouse in New York City to the NAT.  The Court concluded that the taxpayer's argument that the LPC did not enforce restrictions as effectively as the NAT was "speculation * * * not supported by anything but anecdotes, and * * * contrary to evidence specifically related to the * * * property."  Id. at *19.  We concluded that the easement did not materially diminish the value of the taxpayer's property.

Unlike the deed in Scheidelman, which provided a conservation easement only for the facade, petitioners' deed concerns the front, side, rear, and measured height of property, as required by section 170(h)(4)(B) following the enactment of the PPA in 2006.  We note that the taxpayer in Scheidelman completed her donation in 2004 and therefore the special requirements of section 170(h)(4)(B) did not apply.  We also find petitioners' arguments regarding the Trust's ability to enforce restrictions more effectively than the LPC to be convincing.

[*33]   In Dunlap v. Commissioner, T.C. Memo. 2012-126, taxpayers granted a facade easement on their loft building in New York City to the NAT.  The taxpayers' property had a special "sound, first-class condition" designation with the LPC which caused it to be subject to a higher standard of preservation than most other historic structures in New York City.  The Court found that because the building had the sound, first-class condition designation, the facade easement was not more stringent than the LPC regulations and enforcement.  The NAT had failed to provide any easement monitoring of the property, donated in 2003, until 2006.  The Court also noted that the NAT appeared to be more concerned with making money for SMS (a for-profit entity which employed many of the people who were held out to third parties as working for the NAT and which was owned by the same two people who founded the NAT) than monitoring and enforcing the terms of the facade easements it held, until 2006 when its obligations to SMS ended.  We concluded that the value of the easement was zero.

Unlike the easement in Dunlap, petitioners' property does not have a sound, first-class condition designation.  Approximately 150 buildings of the 29,000 structures in New York City that the LPC monitors have this designation.  A property with this designation is subject to a higher standard of preservation.  We also find that the Trust monitored and enforced the terms of the easement it held

[*34] on petitioners' property, whereas it is unclear whether the LPC ever inspected the property. We note that the taxpayers in Dunlap completed their donation before the enactment of section 170(h)(4)(B) and their donation concerned only the facade of their loft building. We further note that although prior cases criticized the Trust for its affiliation with SMS, we are not convinced that the Trust engaged in the same practices at the time of petitioners' donation.

Finally, in Herman v. Commissioner, T.C. Memo. 2009-205, the taxpayer donated the unused development air rights via a conservation easement deed in a historic property in New York, New York, to the NAT. We found that an easement restricting only air rights and the maximum height of the building was not restrictive enough to preserve the certified historic structure of the building.

Although the deed in Herman was not restrictive enough to preserve the certified historic structure of the building, we note that petitioners' deed is much more restrictive than the deed in Herman. Unlike the deed in Herman, petitioners' deed restricts them from making changes not only to the height of the building but also to the building's front, side, and rear, as well as the building's surrounding property.

We further note that although the deed allows the Trust to consent to changes to petitioners' property, the deed requires any rehabilitative work or new

[*35] construction on the facades to comply with the requirements of all applicable Federal, State, and local Government laws and regulations. Section 1.170A-14(d)(5), Income Tax Regs., specifically allows a donation to satisfy the conservation purposes test even if future development is allowed, as long as that future development is subject to local, State, and Federal laws and regulations. See Simmons v. Commissioner, slip op. at 11. Therefore, the deed complies with section 170(h)(4)(B). We conclude that petitioners' easement has a conservation purpose.

### 2. Exclusively for Conservation Purposes

#### a. Conservation Purpose in Perpetuity

Like section 170(h)(2)(C), section 170(h)(5) specifies that the conservation purpose must be protected in perpetuity. Section 170(h)(5)(A) provides that "[a] contribution shall not be treated as exclusively for conservation purposes unless the conservation purpose is protected in perpetuity." Although subsections (h)(2)(C) and (h)(5) both require perpetuity, they are separate and distinct requirements. Section 170(h)(2)(C) specifies that the interest in real property donated by taxpayers must be subject to a use restriction in perpetuity, whereas section 170(h)(5) specifies that the conservation purpose of the conservation

[*36] easement must be protected in perpetuity.  Belk v. Commissioner, 140 T.C. at 12; sec. 1.170A-14(a), Income Tax Regs.

We discussed section 170(h)(5) perpetuity in 1982 East, LLC, quoting the legislative history:

> "[I]t is * * * intended that contributions of perpetual easements * * * qualify for * * * [a section 170] deduction only in situations where the conservation purposes of protecting or preserving the property will in practice be carried out.  Thus, it is intended that a contribution of a conservation easement * * * qualify for a deduction only if the holding of the easement * * * is related to the purpose or function constituting the donee's purpose for exemption (organizations such as * * * historic trusts * * * ) and the donee is able to enforce its rights as holder of the easement * * * and protect the conservation purposes which the contribution is intended to advance." * * *

1982 East, LLC v. Commissioner, slip op. at 17-18 (quoting H.R. Conf. Rept. No. 95-263, at 30-31 (1977), 1977-1 C.B. 519, 523).

We further discussed the legislative intent behind this perpetuity requirement, quoting the Senate report:

> "[For the contribution to be protected in perpetuity] [t]he contribution must involve legally enforceable restrictions on the interest in the property retained by the donor that would prevent uses of the retained interest inconsistent with the conservation purposes. * * * By requiring that the conservation purpose be protected in perpetuity, the committee intends that the perpetual restrictions must be enforceable by the donee organization (and successors in interest) against all other parties in interest (including successors in interest)." * * *

**[\*37]** Id. at 18-19 (quoting S. Rept. No. 96-1007, at 13-14 (1980), 1980-2 C.B. 599, 605-606).

In 1982 East, LLC v. Commissioner, slip op. at 21, we found that the property at issue was not protected in perpetuity because the NAT was not guaranteed a proportionate share of proceeds in the event of a casualty or condemnation before the mortgage held by First Republic Bank was satisfied. In that case First Republic Bank retained a prior claim to all condemnation and insurance proceeds in preference to the donee until that mortgage was satisfied and discharged. Thus, at any point before the mortgage was repaid, the possibility existed for First Republic Bank to deprive the NAT of value that should have otherwise been dedicated to the conservation purpose. Id. at 23. The Court ultimately found that the contribution of donated property failed to comply with the perpetuity requirements of section 1.170A-14(g)(6)(ii), Income Tax Regs.

In Simmons we held that the easement was a valid conservation easement. We stated: "Although the grants do allow L'Enfant to consent to changes to the properties, the grants require any rehabilitative work or new constructions on the facades to comply with the requirements of all applicable Federal, State, and local government laws and regulations." Simmons v. Commissioner, slip op. at 11.

**[*38]**   Respondent argues that there are facts to indicate that the Trust was willing to terminate the easement upon petitioners' request after the easement donation.  A lawyer on behalf of petitioners reached out to the Trust about removing the easement.  Respondent further argues that petitioners' easement is comparable to those in other cases in which the Court found that easements were not granted in perpetuity.

Petitioners argue that the easement was granted in perpetuity because it is binding on petitioners' successors and heirs, it continues as a servitude running in perpetuity with the land, and it survives the termination of the Trust's existence. Petitioners further argue that the Trust enforces the easement in perpetuity by (1) annually monitoring the property to ensure the property is in compliance with the easement, (2) reviewing any requests for alterations, and (3) tracking changes in ownership of the property to communicate easement obligations to new owners. At trial an employee of the Trust testified that petitioners were told the easement would not be removed.

The terms of the deed grant the easement in perpetuity under section 170(h)(5).  The deed grants "an Easement in gross, in perpetuity, in, on, and to the Property".  The deed further states:  "This Easement is binding * * * and shall

[*39] continue as a servitude running in perpetuity with the land." This language shows petitioners' intent to satisfy section 170(h)(5).

We find that the Trust was not willing to terminate the easement. Under the terms of the deed the easement is granted in perpetuity and may not be terminated at any time. The Trust has no intention of releasing the deed. Petitioners requested to have the easement terminated because they were having a difficult time selling their property, and the Trust denied this request.

Moreover, the facts in the case at hand are distinguishable from those in 1982 East, LLC because petitioners do not have a mortgage on the property, and upon sale, exchange, or involuntary conversion the Trust is entitled to its proportionate share of future proceeds, absent controlling State law that provides otherwise.

In Carpenter v. Commissioner, T.C. Memo. 2013-172, we concluded that a conservation easement will not qualify as a qualified conservation contribution if the deed allows mutual agreement to extinguish the easement and extinguishment by judicial proceedings is mandatory. Section 1.170A-14(g)(6), Income Tax Regs., provides that a conservation easement can be extinguished if "the restrictions are extinguished by judicial proceeding and all of the donee's proceeds * * * from a subsequent sale or exchange of the property are used by the donee

[*40] organization in a manner consistent with the conservation purposes of the original contribution."

The deed in this case allows the easement to be extinguished by judicial decree and requires the donees to use proceeds in a manner consistent with the conservation purposes of the original contribution. The deed does not include other language regarding extinguishment. The deeds in Carpenter included the following language:

> If circumstances arise in the future such that render the purpose of this Conservation Easement impossible to accomplish, this Conversation Easement can be terminated or extinguished, whether in whole or in part, by judicial proceedings, or by mutual written agreement of both parties, provided no other parties will be impacted and no laws or regulations are violated by such termination.

Carpenter v. Commissioner, at *4. The deed in the instant case does not include the mutual agreement language and meets the requirements of section 1.170A-14(g)(6), Income Tax Regs.

### b. Recording the Deed

Respondent contends that the deed was not recorded under applicable New York law until 2007 and therefore its conservation purpose was not protected in perpetuity under section 170(h)(5)(A) for 2006.

[*41] N.Y. Real. Prop. sec. 317 (McKinney 2006) stated: "Every instrument, entitled to be recorded, must be recorded by the recording officer in the order and as of the time of its delivery to him therefor, and is considered recorded from the time of such delivery."

The deed was delivered for recording on December 28, 2006, and the required fee was paid. The deed delivered on December 28, 2006, is identical to the deed as recorded; the only error was on the cover sheet to the recording forms, which incorrectly listed the property's address. The Department of Finance provided a receipt for the delivery of the deed. Therefore, the deed was deemed recorded on December 28, 2006. See Manhattan Co. v. Laimbeer, 15 N.E. 712 (N.Y. 1888) ("In the matter of deeds and mortgages it is constantly spoken of that such papers are recorded when left at the clerk's office for such purpose[.]").

Furthermore, section 1.170A-14(g)(3), Income Tax Regs., provides: "A deduction shall not be disallowed under section 170(f)(3)(B)(iii) and this section merely because the interest which passes to, or is vested in, the donee organization may be defeated by the performance of some act or the happening of some event, if on the date of the gift it appears that the possibility that such act or event will

[*42] occur is so remote as to be negligible."[8] We find the possibility that the deed would not be recorded because of a clerical error in the cover sheet to be remote. But cf. Solutto v. Commissioner, T.C. Memo. 1993-614 (finding that the possibility of the donee organization, to which the taxpayers granted facade easements of their units in a condominium building, losing the easement was not so remote as to be negligible because the organization did not obtain subordination agreements to protect it from foreclosure, even though the organization had lost up to 45% of its accepted easements to foreclosure, the easement restrictions were unenforceable until several years after the purported donation, and the easement did not stand in priority to a particular security interest), aff'd without published opinion, 67 F.3d 314 (11th Cir. 1995).

Accordingly, we find that the easement was contributed exclusively for conservation purposes.

---

[8]Sec. 1.170A-14(g)(3), Income Tax Regs., cross-references sec. 1.170A-1(e), Income Tax Regs., which likewise provides:  "If as of the date of a gift a transfer for charitable purposes is dependent upon the performance of some act or the happening of a precedent event in order that it might become effective, no deduction is allowable unless the possibility that the charitable transfer will not become effective is so remote as to be negligible."

**[*43]**    C.    Qualified Appraisal

To be a qualified appraisal under section 170(f)(11)(E), an appraisal of property (1) must be treated as a qualified appraisal under regulations or other guidance prescribed by the Secretary and (2) must be conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed by the Secretary.

        1.    Definition of Qualified Appraisal

Section 1.170A-13(c)(3), Income Tax Regs., defines a qualified appraisal as a document that, among other things:  (1) relates to an appraisal that is made not earlier than 60 days before the date of contribution of the appraised property and not later than the due date (including extensions) of the return on which a deduction is first claimed under section 170; (2) is prepared, signed, and dated by a qualified appraiser; (3) includes (a) a description of the property appraised, (b) the fair market value of such property on the date of contribution and the specific basis for the valuation, (c) a statement that such appraisal was prepared for income tax purposes, (d) the qualifications of the qualified appraiser, and (e) the signature and taxpayer identification number of such appraiser; and (4) does not involve an appraisal fee that violates certain prescribed rules.  The parties stipulated that Mr.

**[\*44]** Haims, who performed the appraisal for petitioners, is a "qualified appraiser" as the term is defined in section 1.170A-13(c)(5), Income Tax Regs.

The regulation imposes substantive requirements on the content of an appraisal report. Scheidelman v. Commissioner, 682 F.3d 189, 198 (2d Cir. 2012), vacating and remanding T.C. Memo. 2010-151. A qualified appraisal provides the IRS with sufficient information to evaluate the claimed deduction and deal more effectively with the prevalent use of overvaluation. Hewitt v. Commissioner, 109 T.C. 258, 265 (1997), aff'd without published opinion, 166 F.3d 332 (4th Cir. 1998).[9]

The parties agree that the Haims report meets the reporting requirements of certain subdivisions in section 1.170A-13(c)(3)(ii), Income Tax Regs.; however, respondent claims that the Haims report fails to meet the reporting requirements of section 1.170A-13(c)(3)(ii)(C), (I), (J), and (K), Income Tax Regs.

Pursuant to section 1.170A-13(c)(3)(ii)(C), Income Tax Regs., an appraisal report must include the date or expected date of the contribution. The Haims

---

[9]Sec. 170(h)(4)(B)(iii) provides further restrictions for any contribution made the year after the enactment of the PPA. See PPA sec. 1213(a)(1), 120 Stat. at 1075-1076. Because petitioners made their contribution in 2006, the year in which the PPA was enacted, sec. 170(h)(4)(B)(iii) does not apply in this case. However, the parties stipulated that the Haims appraisal included a description of the building, its address, block, and lot, and photographs.

**[\*45]** appraisal reports the date or expected date of contribution as December 11, 2006.  Therefore, petitioners' filings gave respondent sufficient information to determine that the expected date of contribution was in December 2006.

Pursuant to section 1.170A-13(c)(3)(ii)(I), Income Tax Regs., an appraisal report should include the appraised fair market value of the donated property on the date or expected dated of contribution.  Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts."  Sec. 1.170-1(c)(2), Income Tax Regs.

The Haims appraisal report used the phrase "market value", which it defined as follows:  "The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably and for self interest, and assuming that neither is under undue duress".

Although we have previously observed that the phrase "market value" is not necessarily synonymous with "fair market value" depending on how the term is defined and used, see Crimi v. Commissioner, T.C. Memo. 2013-51, at *15 ("The

**[*46]** * * * appraisal used a standard of market value as opposed to fair market value[.]"), there is no discernible difference between market value as used by the Haims appraisal and the definition of fair market value in the regulation. We have noted that three elements are necessary for a definition to mirror fair market value: (1) the parties are reasonably aware of all facts relevant to the valued property, (2) the parties cannot be under any compulsion to buy or sell, and (3) the parties must be considered hypothetical rather than actual persons. Bank One Corp v. Commissioner, 120 T.C. 174, 308-310 (2003), aff'd in part, vacated in part and remanded sub nom. J.P. Morgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006). The definition of market value as used in the Haims appraisal is consistent with these criteria and meets the requirements of section 1.170A-13(c)(3)(ii)(I), Income Tax Regs. See also Irby v. Commissioner, 139 T.C. 371 (2012); Crimi v. Commissioner, T.C. Memo. 2013-51.

Pursuant to section 1.170A-13(c)(3)(ii)(J), Income Tax Regs., an appraisal must include the method of valuation used to determine the fair market value. The Haims appraisal uses the "before and after" method. The Haims appraisal explained and identified the method used, including how a paired sales analysis was used and a percentage reduction was applied to the before value. The Haims

**[*47]** appraisal meets the requirements of section 1.170A-13(c)(3)(ii)(J), Income Tax Regs.  See Scheidelman v. Commissioner, 682 F.3d at 196.

Pursuant to section 1.170A-13(c)(3)(ii)(K), Income Tax Regs., an appraisal must report the specific basis for valuation.  The Haims appraisal explains that it used an "an empirically driven market study using paired sales data residential properties in New York".  The Haims appraisal also provides detail on how the properties were selected.

Mr. Haims' approach was very similar to the approach taken in Simmons. The Simmons appraisals, which were qualified appraisals, adequately described the parcels of land owned by the taxpayer and the structures built thereon, contained lengthy discussions of historic preservation easements in general, and identified the method of valuations used and the basis for the valuation reached. The Simmons appraisals also contained statistics gathered by L'Enfant that the appraiser took into account in preparing the appraisals.  Thus, respondent "may deem * * * [Mr. Haims'] 'reasoned analysis' unconvincing, but it is incontestably there."  Scheidelman v. Commissioner, 682 F.3d at 198.  The Haims appraisal meets the requirements of section 1.170A-13(c)(3)(ii)(K), Income Tax Regs.

**[*48]**     2.     Generally Accepted Appraisal Standards

Section 170(f)(11)(E) as amended by the PPA specifies that the qualified appraisal must be conducted by a qualified appraiser in accordance with generally accepted appraisal standards.  The Department of the Treasury provided guidance in the form of Notice 2006-96, 2006-2 C.B. 902.  According to that Notice an appraisal will meet the specifications of section 170(f)(11)(E) if, for example, "the appraisal is consistent with the substance and principles of the Uniform Standards of Professional Appraisal Practice ('USPAP')".  Id. sec. 3.02(2), 2006-2 C.B. at 902.

Respondent contends that there were serious defects in the Haims appraisal and that it was inconsistent with USPAP.  Respondent contends that Mr. Haims used Department of Finance records when he should have used Department of Building Records.  In addition, respondent contends that the after-value analysis Mr. Haims used is not consistent with USPAP.  Petitioners contend that Mr. Haims did use Department of Building records.

Appraising is not an exact science and has a subjective nature.  The Haims appraisal meets the specifications of section 170(f)(11)(E).

**[*49]**  Accordingly, we find that the Haims appraisal was a qualified appraisal for purposes of section 170(f)(11).  Petitioners are entitled to a charitable contribution deduction under section 170(a)(1).

> D.  Valuation

No established market exists for determining the fair market value of an easement.  Simmons v. Commissioner, slip op. at 18; see also Hilborn v. Commissioner, 85 T.C. at 688.  We have used the "before and after" approach on numerous occasions to determine the fair market values of restrictive easements with respect to which charitable contribution deductions are claimed.  See, e.g., Hilborn v. Commissioner, 85 T.C. at 689; Simmons v. Commissioner, T.C. Memo. 2009-208; Griffin v. Commissioner, T.C. Memo. 1989-130, aff'd, 911 F.2d 1124 (5th Cir. 1990).

Under this approach the fair market value of the restriction is equal to the difference (if any) between the fair market value of the encumbered property before the restriction is granted and its fair market value after the restriction is granted.  Sec. 1.170A-14(h)(3)(i), Income Tax Regs.  Where the grant of a conservation restriction has no material effect on the value of the property, or serves to enhance, rather than reduce, the value of the property, no deduction is allowed.  Sec. 1.170A-14(h)(3)(ii), Income Tax Regs.

[*50]  The "before" value of the property generally reflects the highest and best use of the property in its condition just before the donation of the easement. Hilborn v. Commissioner, 85 T.C. at 689.  The highest and best use of the property in its "before" condition takes into account the manner by which the property likely would have been developed absent the easement.  Simmons v. Commissioner, slip op. at 19.  The evaluation of that likelihood also takes into account the effect of existing zoning or historic preservation laws that already restrict the property's development regardless of the existence of the restrictive easement.  Id.

Both petitioners and respondent submitted expert reports regarding the value of petitioners' easement.  Respondent's expert was Richard Marchitelli, executive managing director of Cushman & Wakefield.  Mr. Marchitelli has appraised facade easements in New York City, including townhouses.  He is a member of the Appraisal Institute.  Petitioners' expert was Gary Miller, president of Nico Valuation Services, Ltd.  He is a member of the Appraisal Institute. Mr. Miller has valued more than $1 billion of real estate.

Both experts agree that the "before" value of petitioners' townhouse was $5,200,000.  They have different reasoning for reaching the fair market value, and they differ on the "after" value of the property.  Respondent's expert believes that

[*51] the "after" value of the property was $5,300,000 and that the easement had no influence on the fair market value of the property. Petitioners' expert believes that the "after" value is $4,735,000, resulting in an easement value of $465,000.

### 1. Marchitelli Report and Testimony

The Marchitelli report used the "before and after" method to determine the value of the easement. The report compares sales of townhouses in the Upper East Side of Manhattan that were not encumbered by easements to sales of townhouses in the Upper East Side that were encumbered by easements. The findings in the report indicate that wider, larger townhouses tend to sell for a higher price per square foot than smaller, narrower townhouses.

The report discussed seven sales involving Upper East Side landmark townhouses encumbered by facade easements. The sales took place between June 2005 and September 2007, but all the easements were donated before the PPA was enacted in 2006. The report includes copies of the deeds for the seven properties. The deeds for these easements state: "The term 'facade' as herein consists of all exterior surfaces of the improvements on the Property, including all walls, roofs, and chimneys". Several of these deeds include language which limits the deed to exteriors that are visible on the opposite side of the street. Mr. Marchitelli testified that there are different types of easements and not all easements cover

[*52] side walls or rear walls. He believes that the data does not support a different value for different types of easements.

The seven sales without easements had prices ranging from $1,380 to $2,949 per square foot. Only one townhouse was smaller than petitioners' property. The average price of townhouses without easements was $2,159 per square foot.

The seven townhouses with easements had prices ranging from $1,616 to $2,692 per square foot. The townhouses in five of these seven sales were larger than petitioners' townhouse. The average price of those with easements was $2,195 per square foot. Mr. Marchitelli testified that wider townhouses are more desirable. None of these townhouses was in the same district as petitioners' property. Four of these townhouses were sold after the date of petitioners' easement. Mr. Marchitelli testified that there were no comparable properties at the time in the same district as petitioners' townhouse. He further testified that he determines the size of a townhouse using the tax maps rather than the square footage of the living area of the townhouse because he believes the square footage of the living area overstates the size of the home.

**[*53]**        2.        Miller Report and Testimony

The Miller report uses the sales comparison approach to the "before and after" method by looking at the sales of similar property in surrounding neighborhoods. The size used for comparisons ranged from 3,072 to 3,721 square feet. To determine the value of the facade easement, the report analyzed the market to determine whether the encumbrance of properties by conservation easements has any resultant effect on value. The report describes petitioners' easement as an "envelope easement" that preserved the existing front, rear, top, and any exposed sides of the building from unauthorized alterations. The report notes that petitioners' townhouse is small for the market.

The Miller report addresses floor area ratio (FAR), which is the total floor area in a zoning lot divided by the lot area of that zoning lot. Properties in New York, New York, are subject to zoning restrictions based on FAR. If two or more buildings are in the same zoning lot, the FAR is the sum of their floor areas divided by the lot area. The Miller report concludes that petitioners could be allowed to develop an additional 2,744 square feet on the basis of the unused development right in place. The report explains that it is likely that petitioners' unused development right would be used in the form of a 15-foot extension on the rear and one or two additional levels above the fourth story. Mr. Miller testified

[*54] that he would not expect a purchaser to build a four-story rear addition, which would be an 83% increase in bulk. The report contends that this expansion would be subject to strict guidelines.

In order to value the easement, the report looked at nine paired sales--four with respect to a property referred to as easement No. 1 and five with respect to another property referred to as easement No. 2. Sales of properties with easements were compared to sales of comparable properties that did not have easements. Adjustments were made, and the remaining difference in price shows the impact of the easement. The deeds for both of the properties with easements described each of the easements as a "Scenic, Open, Space and Architectural Facade Conservation Easement on the Property exclusively for conservation purposes". A ratio was used to compare the price the easement property should have sold for according to sales of comparable unencumbered properties and the actual sale price of the encumbered property. The sale price per square foot was the primary unit of comparison. The two properties with easements that were used in the paired sales analysis were much larger than petitioners' townhouse. These properties have square footage of 12,401 and 7,006. The ratios reflecting a discount ranged from -8% to -35% for the first property, which was 12,401 square feet. The range of ratios for the property with 7,006 square feet was -2% to -15%.

[*55] The Miller report concluded that petitioners' easement demonstrates a diminution in value of 9% of its encumbered value. This would reduce the value of the property to $1,435 per square foot from $1,575 per square foot. During his testimony Mr. Miller stated that "there's no scientific way to break down the parts" referring to the 9% diminution in value. He believes that his report explains how he reached the diminution in value of 9%. He testified that keeping a residence in "good repair" is more expensive if you have an easement because you are required by the easement to keep it maintained and preserved.

3. Analysis

Respondent contends that petitioners' easement has no value. Respondent compares it to the easements in Dunlap v. Commissioner, T.C. Memo. 2012-126, and Scheidelman v. Commissioner, T.C. Memo. 2013-18. As discussed above, in Dunlap the taxpayers donated a facade easement regarding a property in New York, New York, to the NAT that restricted the ability to alter, construct or remodel the facade without the NAT's express written consent. The donation took place in 2003. We concluded that the value of the facade easement was zero because the it did not result in increased restrictions on that property above those required and enforced by the LPC on the date of the donation. In Scheidelman we held that the taxpayers' facade easement was valued at zero because, among other

[*56] things, the property was already restricted by the LPC.  The facade easement was donated in 2004.  Respondent argues that petitioners' easement also mirrors the existing restrictions already in local law.

Mr. Marchitelli had several concerns with the Miller report.  He believes that people buy a house to live in, and he testified that townhouses historically have not been renovated to increase their size.  He believes that the Miller report overemphasized the value of development rights and that the market does not attach significance to the development rights.

Mr. Marchitelli raised the issue that the Miller report does not compare the easement properties discussed in the report with petitioners' townhouse.  He believes that comparisons are being made to two separate properties with easements and that the report does not compare these properties to petitioners' townhouse.  He believes that this analysis makes the report "convoluted".

Petitioners contend that it is appropriate to make adjustments to comparable sale figures when using the compared sales approach.  See Friedberg v. Commissioner, T.C. Memo. 2011-238, slip op. at 23.  They further contend that if a buyer in the Carnegie Hill neighborhood had the choice of buying two identical properties at the same price but for the easement, the buyer would choose the property without the easement.

**[*57]**   Mr. Miller testified that he did not compare petitioners' property to the comparison sale properties because petitioners' property was substantially lower in value.  Mr. Miller criticized the Marchitelli report for not making adjustments for the condition of property, such as an elevator and servant's quarters.

Ordinarily, any encumbrance on real property, however slight, would tend to have some negative effect on the property's fair market value.  Evans v. Commissioner, T.C. Memo. 2010-207, slip op. at 15.  We do not find respondent's expert report credible insofar as it maintained that an easement would have absolutely no effect on the fair market value of a valuable piece of real estate.  Simmons v. Commissioner, slip op. at 26.  In White House Hotel Ltd. P'ship v. Commissioner, 615 F.3d 321, 327 (5th Cir. 2010), vacating and remanding 131 T.C. 112 (2008), the Court of Appeals for the Fifth Circuit noted:  "[R]ather extraordinarily, * * * [the Commissioner's expert] assigned the easement a value of zero".

The paired sales analysis involves a comparison of the fair market value of a property with and without an easement.  The fair market value of the property with the easement is divided by the fair market value of the property without the easement to derive a diminution percentage attributable to the conservation

**[*58]** easement involved.  Strasburg v. Commissioner, T.C. Memo. 2000-94, slip op. at 12 n.8.  We have approved this method, which we refer to as the "percentage diminution approach".  See, e.g., Butler v. Commissioner, T.C. Memo. 2012-72, slip op. at 75.

Since both respondent and petitioners' experts agree that the "before" value is $5,200,000, we will use that as the "before" value.  We conclude that neither petitioners nor respondent was persuasive about the value of the easement.

We do not agree with respondent that the easement had no value.  To determine the value of the easement, we should consider whether the easement is more restrictive than the restrictions provided by local law.  See Hilborn v. Commissioner, 85 T.C. 677.  As discussed above, petitioners' easement is more restrictive than local law.  Respondent's reliance on Dunlap and Scheidelman is misplaced.  Moreover, we have previously allowed charitable contribution deductions even if the property was subject to local conservation law before the granting of the easement.  Simmons v. Commissioner, slip op. 25 (noting that local preservation laws do not necessarily prevent charitable contributions); see Griffin v. Commissioner, T.C. Memo. 1989-130; Nicoladis v. Commissioner, T.C. Memo. 1988-163.

[*59]   Petitioners also did not meet their burden of proving that the value of the easement is $465,000.  We do not rely on easement sale No. 1 in the Miller report because the property with the easement is 12,401 square feet.  We realize that appraisers have to rely on sales that are available at the time of the appraisal and that adjustments can be made; however, the property used for easement sale No. 1 is substantially larger than petitioners' property, and a reasonable comparison cannot be made.  The property used for easement No. 1 is 26.5 feet wide, and petitioners' townhouse is only 15 feet wide.  The testimony of both Mr. Miller and Mr. Marchitelli indicates that a wider townhouse has more value than a narrow townhouse.  Twenty adjustments were made in this comparison.  When numerous adjustments have to be made, there is a likelihood that the outcome is less reliable than in a comparison where fewer adjustments have to be made.

The easement sale No. 2 property is still larger than petitioners' property, but unlike the easement sale No. 1 property, it is not substantially larger.  The property used for easement No. 2 is 7,006 square feet and 20 feet wide.  This is still larger and wider than petitioners' property, but it provides a more reasonable comparison than easement sale No. 1.  Mr. Miller made adjustments to the four comparable sales, and the diminution in value ranged from 2% to 13%.

**[\*60]**   The 9% diminution in value used by Mr. Miller is too high.  We agree with petitioners that there is value for an envelope easement.  There is a reasonable chance that the property may not be able to be developed or modified, especially in the rear of the property.  Even though all the paired sales in the Miller report are based on wider properties than petitioners' townhouse, we conclude a more reasonable diminution would be 2%.

The property in the comparable sale analysis for easement sale No. 2 with the 2% diminution in value is the property closer is in size to petitioners' property.  This comparable property is 4,500 square feet and 20 feet wide.  The price per square foot is $1,956.  According to the Miller report the "before" value of petitioners' property is $1,561 per square foot.  Mr. Miller made adjustments in using this sale, including adjustments for size, physical characteristics, and condition.  Both the comparable property and the easement No. 2 property are five feet wider than petitioners' property.

We note that the easement No. 2 property in the Miller report does not explicitly include the rear of the property.  The easement No. 2 property, however, is larger and wider than petitioners property, and those differences balance out the easement No. 2 property does not include the rear of the property.  We are not required to accept the Miller valuation in its entirety.  See Symington v.

[*61] Commissioner, 87 T.C. 892, 902 (1986); Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980).

We have considered the expert reports and testimony and conclude that there should be only a 2% reduction in value. This decrease stems from heightened financial burdens of an eased facade, enforcement actions of the Trust, and the scope of the easement. See Simmons v. Commissioner, slip op. at 25. The value of petitioners' easement is $104,000.

II.     Penalties

Respondent contends that petitioners are liable for penalties under section 6662(h) or, in the alternative, under section 6662(a).

    A.     Section 6662(h)

PPA sec. 1219(a), 120 Stat. at 1083, made several changes to section 6662(h). Section 6662(h) provides a 40% penalty for gross valuation misstatements. Gross valuation misstatements occurs when the value of any property reported on an income tax return is 200% or more of the amount determined to be the correct amount, among other things. See sec. 6662(h)(2). Before the enactment of the PPA the threshold for gross valuation misstatement was 400% or more of the amount determined to be the correct amount. PPA sec.

**[*62]** 1219(a), 120 Stat. at 1083.  The PPA also eliminated the reasonable cause

exception for gross valuation misstatements.  Id.

Petitioners valued the easement at $605,000.  The amounts they reported on

their 2006 and 2007 Federal income tax returns reflected this value.  We conclude

that the easement has a value of $104,000.  Thus, petitioners' valuation of

$605,000 is greater than 200% of the amount determined to be the correct value.

Petitioners are liable for a gross valuation misstatement.  Therefore, a 40% penalty

is imposed on the portion of the underpayment attributable to the gross valuation

misstatement.  The reasonable cause exception does not apply in the case of gross

valuation misstatements with respect to charitable donations.  See sec. 6664(c)(3).

A penalty pursuant to section 6662(h) applies to any portion of an

underpayment for the year to which a deduction is carried that is attributable to a

gross valuation misstatement for the year in which the carryover of the deduction

arises.  See sec. 1.6662-5(c), Income Tax Regs.  Petitioners therefore are liable for

this penalty for both tax years 2006 and 2007.

Petitioners contend that the section 6662(h) penalty should not be assessed

because it is an excessive fine under the Eighth Amendment to the United States

Constitution.  The Eighth Amendment provides:  "Excessive bail shall not be

required, nor excessive fines imposed, nor cruel and unusual punishments

**[*63]** inflicted." U.S. Const. amend. VIII. The touchstone of the inquiry is the "principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." United States v. Bajakajian, 524 U.S. 321, 334 (1998).

The purpose of civil tax penalties is to encourage voluntary compliance. Cf. United States v. Boyle, 469 U.S. 241, 245 (1985) ("Congress' purpose in the prescribed civil penalty [section 6651(a)(1)] was to ensure timely filing of tax returns to the end that tax liability will be ascertained and paid promptly."). Indeed, the Commissioner's policy statement explains that "[p]enalties are used to enhance voluntary compliance[.] * * * Penalties provide the Service with an important tool * * * because they enhance voluntary compliance by taxpayers." Internal Revenue Manual pt. 1.2.20.1.1 (June 29, 2004).

In Helvering v. Mitchell, 303 U.S. 391 (1938), the Supreme Court analyzed whether a civil fraud penalty under the Revenue Act of 1928 was punishment or purely remedial in character. The Court found the penalty to be remedial, stating: "The remedial character of sanctions imposing additions to a tax has been made clear by this Court in passing upon similar legislation. They are provided primarily as a safeguard for the protection of the revenue and to reimburse the

[*64] government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud." Id. at 401.

In Little v. Commissioner, 106 F.3d 1445 (9th Cir. 1997), aff'g T.C. Memo. 1993-281, the Court of Appeals for the Ninth Circuit held that the IRS' imposition of negligence and substantial understatement penalties under section 6662 did not violate the Excessive Fines Clause because they are remedial and do not constitute "punishment". The Court of Appeals held that the penalties at issue are "purely revenue raising because they serve only to deter noncompliance with the tax laws by imposing a financial risk on those who fail to do so", and that the taxpayer failed to establish that the penalties in question were penal sanctions unrelated to the Government's interest in raising revenue. Id. at 1454-1455.

We have similarly found contentions that civil tax penalties violate the Excessive Fines Clause to be without merit. See, e.g., Acker v. Commissioner, 26 T.C. 107, 114 (1956); Ryan v. Commissioner, T.C. Memo. 1998-62; Louis v. Commissioner, T.C. Memo. 1996-257, aff'd, 170 F.3d 1232 (9th Cir. 1999).

Section 6662(h) does not violate the Excessive Fines Clause. As the Court of Appeals for the Fourth Circuit stated: "Even assuming arguendo that the Excessive Fines Clause is implicated in this case, there is no basis for concluding that the * * * [civil tax penalty] is excessive. If the * * * [civil tax penalty] is

**[*65]** always calculated as * * * [a percentage] of the tax deficiency regardless of the means by which the income is accrued, the sanction could not be excessive as to one person, but not excessive as to another." Thomas v. Commissioner, 62 F.3d 97, 103 (4th Cir. 1995), aff'g T.C. Memo. 1994-128. Section 6662(h) is calculated as a percentage of an underpayment, so it bears a relationship to the gravity of the offense that it is designed to remedy.

Moreover, perceived overvaluation of noncash charitable contributions prompted Congress to amend the tax laws several times. Consistent with this perception the PPA lowered the threshold for imposing penalties related to deductions for charitable contribution property. Such congressional actions demonstrate the remedial nature of the penalty and Congress' intent to regulate the difficult realm of valuing charitable contribution property.

B.    Section 6662(a)

Respondent argues in the alternative that petitioners are liable for a section 6662(a) and (b)(1) and (2) accuracy-related penalty due to negligence or disregard of rules or regulations or a substantial understatement of income tax. This issue does not need to be addressed since petitioners are liable for a section 6662(h) penalty.

**[\*66]**  Any contentions we have not addressed are irrelevant, moot, or meritless.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.